The **WASHINGTON FREE COMMUNITY**

v.

The **STATE'S ATTORNEY OF MONT-GOMERY COUNTY, MARYLAND;** Attorney General of Maryland; Special Assistant Attorney General in Charge of Subversive Activities.

**Civ. No. 20610.**

United States District Court,
D. Maryland.

Feb. 5, 1970.

Sobeloff, Circuit Judge, dissented in part.

Joseph Forer, Washington, D. C., and Harold Buchman, Baltimore, Md., for plaintiff

Francis B. Burch, Atty. Gen., of the State of Maryland, Alfred J. O'Ferrall, III, Edward F. Borgerding and Robert A. DiCicco, Asst. Attys. Gen., Baltimore, Md., for defendants.

Before SOBELOFF, Circuit Judge, and THOMSEN and NORTHROP, District Judges.

THOMSEN, District Judge:

Plaintiff, which publishes an "underground" newspaper known as The Washington Free Press, seeks a judgment (1) declaring that §§ 2, 3, 5, 7, 8 and 9 and portions of § 6 of Article 85A of the Maryland Code (generally known as the Ober Act) are unconstitutional and may not validly be enforced; (2) enjoining defendants, the State's Attorney of Montgomery County, Maryland, the Attorney General of Maryland, and the Special Assistant Attorney General in Charge of Subversive Activities from enforcing any of those sections against the plaintiff, its officers, directors and employees, or The Washington Free Press, its editors, printers, distributors and circulators; and from otherwise interfering with the printing, distribution and circulation of The Washington Free Press under color of those sections; and (3) granting other and further relief.

Defendants have moved to dismiss the complaint and plaintiff has moved for a summary judgment. There appears to be little if any dispute about the facts.

The Washington Free Press appears every two weeks. Its principal circulation is in the greater Washington area, including Montgomery and Prince George's County, Maryland. The paper retails for 20¢ a copy in the District of Columbia and 25¢ a copy elsewhere. The last issue which appeared before March 3, 1969, had a paid circulation of approximately 16,000. Shortly thereafter the circulation increased to 23,000, where it remained until the hearing in July.[1]

On March 3 Judge James H. Pugh, of the Circuit Court for Montgomery County, Maryland, in his charge to the grand jury for that County convened for the term March 3—October 10, said:

"Article 85A of the Maryland Code deals with subversive persons and organizations and Section 9 thereof provides that the Judge of the Circuit Court, when in his discretion it appears appropriate, or when informed by the State's Attorney that there is information or evidence of the character described in this Article of the Code to be considered by the Grand Jury, shall charge the Grand Jury to inquire into violations of this article for the purpose of proper action.

"It has come to the attention of the Court that a certain newspaper is being printed and published in Montgomery County and is being circulated in the County, which advocates the destruction of the State and destruction between the schools of this County and the duly constituted law enforcement agencies thereof."

Judge Pugh read to the grand jury § 2 of Article 85A, which is among those

---

1. Unless otherwise indicated, all dates are in 1969.

sections set out in the margin,[2] and said:

"I have two copies of this newspaper which I hand herewith to your foreman. If you find that this law is being violated, it will be your duty to indict not only the individuals you find to have violated it, but the corpo-

---

2. "Article 85A

\* \* \* \* \*

"§ 2. Unlawful acts.

"It shall be a felony for any person knowingly and wilfully to:

"(a) Commit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of, the constitutional form of the government of the United States, or of the State of Maryland, or any political subdivision of either of them, by revolution, force, or violence; or

"(b) Advocate, abet, advise, or teach by any means any person to commit, attempt to commit, or assist in the commission of any such act under such circumstances as to constitute a clear and present danger to the security of the United States, or of the State of Maryland or of any political subdivision of either of them; or

"(c) Conspire with one or more persons to commit any such act; or

"(d) Assist in the formation or participate in the management or to contribute to the support of any subversive organization knowing said organization to be a subversive organization or a foreign subversive organization; or

"(e) Destroy any books, records or files, or secrete any funds in this State of a subversive organization or a foreign subversive organization, knowing said organization to be such.

"Any person who shall be convicted by a court of competent jurisdiction of violating any of the provisions of this section shall be fined not more than twenty thousand dollars ($20,000), or imprisoned for not more than twenty (20) years, or both, at the discretion of the court.

"§ 3. Membership in subversive organization.

"It shall be a felony for any person after June 1, 1949 to become, or after September 1, 1949 to remain a member of a subversive organization or a foreign subversive organization knowing said organization to be a subversive organization or foreign subversive organization. Any person who shall be convicted by a court of competent jurisdiction of violating this section shall be fined not more than five thousand dollars ($5,000), or imprisoned for not more than five (5) years, or both, at the discretion of the court.

\* \* \* \* \*

"§ 5. Dissolution of organizations.

"It shall be unlawful for any subversive organization or foreign subversive organization to exist or function in the State of Maryland and any organization which by a court of competent jurisdiction is found to have violated the provisions of this section shall be dissolved, and if it be a corporation organized and existing under the laws of the State of Maryland a finding by a court of competent jurisdiction that it has violated the provisions of this section shall constitute legal cause for forfeiture of its charter and its charter shall be forfeited under the provisions of Article 23, §§ 104–108, inclusive, Annotated Code of Maryland [1939 Code] and all funds, books, records and files of every kind and all other property of any organization found to have violated the provisions of this section shall be seized by and for the State of Maryland, the funds to be deposited in the State treasury and the books, records, files and other property to be turned over to the Attorney General of Maryland.

"§ 6. Special assistant attorney general —Appointment, salary and supervision.

"The Attorney General of Maryland is hereby authorized and directed to appoint an additional assistant to perform the duties of special assistant attorney general in charge of subversive activities whose annual salary shall be provided in the budget, and whose responsibility it shall be, under supervision of the Attorney General, to assemble, arrange and deliver to the State's attorney of any county or of Baltimore City, together with a list of necessary witnesses, for presentation to the next grand jury to meet in said county or city, all information and evidence of matters within said county or Baltimore City which have come to his attention, relating in any manner to the acts prohibited by this article, and relating generally to the purposes, processes and activities of communism and any other or related subversive organizations, associations, groups or persons.

"§ 7. Same—Assistance in collection of evidence and information.

"For the collection of any evidence and information referred to in this article, the Attorney General is hereby directed to call upon the Superintendent of State

ration who causes its publication and the printer who prints it."

Judge Pugh thereupon delivered to the foreman of the grand jury two copies of the February 1–14 issue of plaintiff's paper.

Prior to March 3 the paper had been printed in Maryland. Plaintiff alleges that as a result of Judge Pugh's instructions to the grand jury, which were the subject of news articles in Washington area newspapers, plaintiff was unable to find a printer in Maryland who would print the paper, that plaintiff was unable to publish a March 1–15 issue and was able to publish the March 16–31 issue only by obtaining at "great expense and inconvenience" a printer in New York state. According to the answer to interrogatories and exhibits the printing cost increased from $725 for the 20-page issue of February 16–28 (16,000 copies) to $1,080 for the 24-page issue of March 16–31 (22,000 copies).

The February 1–14 issue is fairly typical of other issues offered in evidence. Among the contents are articles entitled "Wanted—Larry Eliot", which concerns identifying and terrorizing state undercover narcotics agents, "Counter-Inauguration: Rome Wasn't Destroyed In A Day", "Emergency Letter To My Brothers and Sisters In The Movement" by Jerry Rubin, "General Marsbars", a draft advice column, "Revolution In The High Schools" and "The Youth Made The Revolution And The Youth Will Keep It". It promotes the use of drugs by high school students and others. The following passage from an article entitled "You Can Be Arrested", under the subhead "Revolution in The High School" goes about as far as any articles in the February 1–14 issue or other issues submitted to the Court in advocating revolutionary changes:

"Now revolutionary youth must work to unite the political and cultural

Police, the police commissioner of Baltimore City and other county and municipal police authorities of the State to furnish to the special assistant hereinbefore provided for, such assistance as may from time to time be required. Such police authorities are directed to furnish information and assistance as may be from time to time so requested. The special assistance attorney general herein provided for may testify before any grand jury as to matters referred to in this article as to which he may have information. "§ 8. Same—Records and reports.

"The Attorney General shall require the special assistant herein provided for, to maintain complete records of all information received by him and all matters handled by him under the requirements of this article. Such records as may reflect on the loyalty of any resident of this State, shall not be made public or divulged to any person except with permission of the Attorney General to effectuate the purposes of this article. He shall further require the publication, printing and appropriate distribution of all reports of grand juries of this State made as hereinafter provided. The Attorney General shall include in his budget estimates, adequate moneys for the printing and distribution of the said reports, and for all other expenses of administering this article. To the extent that his time may

not be required in his duties under this article, the special assistant attorney general shall be available for and perform such other duties as may be assigned to him by the Attorney General. "§ 9. Duty of judges as to grand jury.

"The judge of the criminal court of each county and of Baltimore City, when in his discretion it appears appropriate, or when informed by the State's attorney that there is information or evidence of the character described in § 6 of this article to be considered by the grand jury, shall charge the grand jury to inquire into violations of this article for the purpose of proper action, and further to inquire generally into the purposes, processes and activities and any other matters affecting communism or any related or other subversive organizations, associations, groups or persons. Any grand jury charged by the court as provided herein shall not later than the conclusion of its term of service prepare a written report, separate from all other matters considered by said grand jury, of its findings upon the subjects placed before it under the requirements of this article, provided, however, such report shall not charge any residents of this State with being disloyal unless they shall have been indicted under the provisions of this article or other provisions of the criminal law of this or some other jurisdiction."

aspects of the revolution. We must proceed with the destruction of the state which is attempting to defeat us by regaining control of the drug supply, which can then be used in support of the established order (opiates for the materially poor; ups for the spiritually poor; hallucinogens for psychological warfare; and a tightly controlled grass market utilized as a safety valve.)

"Montgomery County high school students must now begin to prepare a counter-offensive aimed at destroying the connections between the schools and law enforcement agencies. Get stoned. Turn on your fellow students, especially those in the lower grades. Deal. Expand the supply as well as the demand. Drive the prices down. Sell it cheap. It's a worthwhile community service.

" * * * (sprinkled with four-letter words)

"We are the Revolution.

"We are the Forces of the American Liberation. * * *"

The grand jury has now been discharged. It filed no indictment nor presentment against The Washington Free Community or anyone connected with it. A police witness did appear before the grand jury, reportedly in connection with the investigation suggested by Judge Pugh. It does not appear that any of the defendants has ever threatened to have The Washington Free Community or anyone connected with it indicted under any section of Article 85A.

There has been other litigation in this Court and in Montgomery County with respect to allegedly obscene cartoons of Judge Pugh which appeared in the March 16–31 and the April 16–30 issues. See Washington Free Community v. State's Attorney, 300 F.Supp. 487 (D. Md.1969).

The sections of article 85A under attack in this case are set out in footnote 2. All sections of Article 85A were attacked in Whitehill v. Elkins, 258 F.

Supp. 589 (D.Md.1966), reversed, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967), opinion on remand, 287 F.Supp. 61 (D.Md.1968).

The result of the *Whitehill* litigation was that this Court entered a decree declaring invalid the definitions of "subversive person", "subversive organization" and "foreign subversive organization" contained in § 1, declaring invalid all of §§ 11, 13 and 14 (the loyalty provisions), and enjoining enforcement of §§ 11, 13 and 14. The Supreme Court had considered only the provisions of Article 85A which related to the loyalty oath, and on remand this Court held that Whitehill was not entitled to a declaration that Article 85A is invalid in its entirety. This Court said:

" * * * Plaintiff has not alleged that he is a taxpayer. Even if he did, he has not shown any special interest in having declared invalid the portions of Article 85A beyond §§ 1, 11, 13 and 14, or that they have any direct application to him. See Flast v. Cohen, [392 U.S. 83], 88 S.Ct. 1942, 20 L. Ed.2d 947 (1968). Preemption may well have occurred in regard to those portions of Article 85A which relate to seditious activity against the government of the United States in the light of Commonwealth of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956), but plaintiff's relation to those provisions is not shown." 287 F.Supp. at 65.

The plaintiff herein claims to have such standing.

■ The first question to be decided is whether this Court should grant any injunctive relief. The general rule, embodied in 28 U.S.C. § 2283, is that a court of the United States should not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments. The Supreme Court has added an exception to cover "special circumstances". Dombrowski v. Pfister, 380 U.S. 479,

484, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Zwickler v. Koota, 389 U.S. 241, 253–254, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Cameron v. Johnson, 381 U.S. 741, 85 S.Ct. 1751, 14 L.Ed.2d 715 (1965) and 390 U.S. 611, 618 (1968). No special circumstances which would justify the exercise by a federal court of jurisdiction to grant injunctive relief are present in this case.

■ Moreover, the equitable grounds which would justify an injunction at this time do not appear from the facts. No prosecution under any provisions of Article 85A is pending or is now threatened by any of the defendants or anyone else. No irreparable injury has been shown.

■ The questions of abstention and of injunctive relief are not the same. The Supreme Court has stated that "a request for a declaratory judgment that a state statute is overbroad on its face must be considered independently of any request for injunctive relief against the enforcement of that statute". Zwickler v. Koota, 389 U.S. 241, 254, 88 S.Ct. 391, 399 (1967).

■ In that case the Supreme Court indicated that courts of the United States should not abstain from declaring constitutional rights arising under the First Amendment in the absence of special circumstances, such as the susceptibility of a state statute to a construction by the state courts that would avoid or modify the constitutional question. 389 U.S. at 248–249, 88 S.Ct. 391.

■ The Court does not construe Zwickler v. Koota to hold or imply that every defendant or prospective defendant who is being prosecuted in a state court under a statute which may raise First Amendment points is entitled to have the prosecution held up until a three-judge court is convened, the necessary evidence presented to it, and a declaratory judgment rendered, which would not be binding on the state court unless and until it is reviewed by the Supreme Court.

Moreover, before a declaratory judgment is rendered by any federal court, there must be not only adequate grounds of federal jurisdiction, but also an "actual controversy" within the meaning of 28 U.S.C. § 2201.

When the Zwickler case came before the Supreme Court for a second time, in Golden v. Zwickler, 394 U.S. 103, 89 S. Ct. 956, 22 L.Ed.2d 113 (1969), the Court said:

"The District Court erred in holding that Zwickler was entitled to declaratory relief if the elements essential to that relief existed '[w]hen this action was initiated.' The proper inquiry was whether a 'controversy' requisite to relief under the Declaratory Judgment Act existed at the time of the hearing on the remand. We now undertake that inquiry.

" '[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, "concrete legal issues, presented in actual cases, not abstractions" are requisite. This is as true of declaratory judgments as any other field.' United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). 'The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)." 394 U.S. at 108, 89 S.Ct. at 959–960.

We come therefore to two questions: Was there an actual controversy between plaintiff and defendants at the time of the hearing in July? Is there an actual controversy now, since the grand jury has been discharged?

There was an "actual controversy" at the time of the hearing in July, since the grand jury was still in session and Judge Pugh's charge had not been implemented or rejected.

 Whether there is still an "actual controversy" is doubtful; but the absence of an "actual controversy" now would not necessarily mean that the case has become moot. Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). See also Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968). Applying the principles announced in those cases, we conclude that under all the evidence and circumstances this is an appropriate case for a declaratory judgment.

██ The Ober Act deals with two principal subjects—sedition and loyalty. The *Whitehill* litigation dealt only with the loyalty provisions. The constitutional infirmities in the sections dealing with the loyalty oath were such that the Court on remand held that the entire loyalty oath "scheme" had been frustrated. 287 F.Supp. at 65. The statement in the opinion on remand that "the presumption of severability has been destroyed" must be read in that context. The decision on remand that constitutional defects permeated the entire loyalty oath scheme does not mean that all the provisions dealing with sedition also automatically fall. United States v. Jackson, 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); National Association of Letter Carriers v. Blount, 305 F.Supp. 546, 550 (D.D.C., 3JJ Ct., 1969). The Court should consider each of those provisions to see whether it is tied to the definitions in § 1 or other provisions of the Act which

were held to be overbroad. The Supreme Court's decision in the *Whitehill* case was based upon its conclusions that §§ 1 and 13 could not be construed as applying only to those who seek to overthrow the government by force and violence; the Court construed §§ 1 and 13 to reach not only (1) "those who would 'alter' the form of government 'by revolution, force, or violence'," but also (2) "those who are members of a subversive organization or a foreign subversive organization". 389 U.S. at 59, 88 S.Ct. at 186. The Court held the oath invalid because the Court concluded that "since the authority to prescribe oaths is provided by § 11 of the Act and since it is in turn tied to §§ 1 and 13, we must consider the oath with reference to §§ 1 and 13, not in isolation". 389 U.S. at 56–57, 88 S.Ct. at 185. That reasoning applies not only to §§ 1, 11, 13 and 14, which were directly involved in the *Whitehill* case, but also to §§ 2(d), 2(e), 3, 5 and 9, which plaintiff challenges in this case, and to so much of § 6 as attempts to deal with "subversive persons" and "subversive organization", as defined in § 1. The reasoning does not apply to § 2(a), (b) and (c), which do not contain those words and were not discussed in any of the opinions in the *Whitehill* case, nor to §§ 6, 7 and 8 insofar as they deal with the actions prohibited by § 2(a), (b) and (c).

██ Based upon the opinions in *Whitehill*, plaintiff is entitled to a declaratory judgment that §§ 2(d) and (e), 3, 5 and 9 (see footnote 2) are unconstitutional because they depend upon the definitions of "subversive organization", "foreign subversive organization", or "subversive person" contained in § 1 and held in *Whitehill* to be unconstitutionally vague.

The first three subsections of § 2 (see footnote 2) present a different problem. None of them depends upon the definitions condemned in *Whitehill*.

██ It is true that no prosecution could be maintained under § 2(a), (b) or (c) for acts or attempts, however violent, to overthrow, destroy or alter the

constitutional form of government of the United States. Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956). But the preemption rule announced in that case does not apply to acts or attempts to overthrow, destroy or alter the constitutional form of government of the State of Maryland or any political subdivision thereof. "The [Nelson] opinion made clear that a State could proceed with prosecutions for sedition against the State itself." Uphaus v. Wyman, 360 U.S. 72, 76, 79 S.Ct. 1040, 1044, 3 L.Ed.2d 1090 (1959).

■■■ Subsection (a) of § 2 deals with action, not with speech or membership. No one has suggested that plaintiff violated that section. The Court of Appeals of Maryland has held that the word "revolution", as used in § 15 of Article 85A, "does not mean a peaceful revolution, but means a revolution accomplished by force or violence". Shub v. Simpson, 196 Md. 177, 191, 76 A.2d 332 (1950). See also Gerende v. Election Board, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1951); Whitehill v. Elkins, 389 U.S. at 57, 60, 88 S.Ct. 184 (1967). The same construction should be applied to the word "revolution" in § 2(a). So construed, § 2(a) is constitutional. At the very least, the Maryland Courts should be given an opportunity to construe § 2(a) and probably thereby avoid any constitutional question. Zwickler v. Koota, 389 U.S. at 248, 249, 88 S.Ct. 391.

The question presented by § 2(b) (see footnote 2) is answered by Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), where the Supreme Court held that §§ 2(a) (1), 2(a) (3) and 3 of the Smith Act, 54 Stat. 671, 18 U.S.C. § 2385, as construed and applied in that case, do not violate the First Amendment or other provisions of the Bill of Rights and do not violate the First or Fifth Amendments because of indefiniteness. The Court held that "the statute may be applied where there is a 'clear and present danger' of the substantive evil which the legislature had the right to prevent." 341 U.S. at 515, 71 S.Ct. at 870.[3]

Section 2(b) of Article 85A contains the limiting words "under such circumstances as to constitute a clear and present danger to the security * * * of the State * * *."

■■■ Section 2(b) is not unconstitutional on its face, but may only be applied where a clear and present danger to the security of the State or one of its subdivisions is shown. In such a case the jury should be instructed in accordance with the principles announced in Dennis v. United States, supra, and Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

■■■ An indictment of plaintiff under § 2(b) based only upon the facts submitted to the grand jury by Judge Pugh, essentially the February 1–14 is-

---

3. In Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), after citing *Dennis* to show that Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), has been discredited by later decisions, the Court said: "These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 447, 89 S.Ct. at 1829. In a footnote to the quoted passage the Court added: "It was on the theory that the Smith Act, 54 Stat. 670, 18 U.S.C. § 2385,

embodied such a principle and that it had been applied only in conformity with it that this Court sustained the Act's constitutionality. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). That this was the basis for *Dennis* was emphasized in Yates v. United States, 354 U.S. 298, 320–324, 77 S.Ct. 1064, 1077–1079, 1 L.Ed.2d 1356 (1957), in which the Court overturned convictions for advocacy of the forcible overthrow of the Government under the Smith Act, because the trial judge's instructions had allowed conviction for mere advocacy, unrelated to its tendency to produce forcible action." 395 U.S. at 447, 448, n. 2, 89 S.Ct. at 1829–1830.

sue, could not have been constitutionally maintained.

 For the same reasons, § 2(c) of Article 85A (see footnote 2) is not unconstitutional on its face; an indictment thereunder can be sustained only where the tests in *Dennis* and *Brandenburg* are met; and therefore an indictment of plaintiff under § 2(c) based only upon the facts submitted to the grand jury by Judge Pugh could not have been constitutionally maintained.

 Sections 6, 7 and 8 are not facially unconstitutional, because the same tests are not applied to the gathering of information by the Attorney General that are applied to criminal prosecutions. Whether the State will wish to continue the office, in view of the decisions in *Whitehill* and in this case, is a matter for the State, not this Court.[4]

In conclusion, plaintiff is not entitled to any injunctive relief; it is entitled to a declaratory judgment that §§ 2(d) and (e), 3, 5 and 9, the constitutionality of which are challenged by plaintiff in this case, are unconstitutional on their face; but the Court further declares that §§ 2(a), (b) and (c), 6, 7 and 8 are not facially unconstitutional.[5]

SOBELOFF, Circuit Judge (concurring in part and dissenting in part):

This case presents one more attempt to breathe life into the Ober Act, the fatal defects of which the Supreme Court exposed in Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228 (1967). I believe that we should not hesitate now to sign the death certificate for this long-lingering corpse. Since the Grand Jury specifically charged to investigate possible violations of the Ober Act by this plaintiff has been discharged without having taken action I agree that there is no need for an injunction at this time.[1] However, that determination should be without prejudice to the right of plaintiff to renew in this proceeding the request for an injunction if the threat of prosecution looms again in the future. At any rate we should grant full declaratory relief and I dissent from the majority's refusal to declare sections 2(a), (b) and (c), 6, 7, and 8 invalid.

I.

In Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184 (1967), the Supreme Court found the oath provisions of the Ober Act unconstitutional. When the case was originally before the district court, the severability clause, section 18 of the Ober Act, was described as being "as clear an expression of severability as could be found." 258 F.Supp. 589, 596 (D.Md.1966). However, the Supreme Court was not impressed, 389 U.S. at 59, 88 S.Ct. 184, and on remand the three-judge panel (including two of the three judges in the present case[2]) held, after extensive discussion, that the non-oath provisions of the Ober Act were not severable from those the Supreme Court

---

4. Some newspaper editors and others are opposed to §§ 6, 7 and 8 because of a single incident in the 1950s arising out of an investigation which many considered overzealous. Some of those opponents are unaware of or have forgotten the valuable and completely unpublicized services rendered by the special assistant attorney general to school boards and other agencies of the state and its subdivisions, particularly in the decade after World War II, when persons rightly or wrongly accused of communist activity were checked and reports made to the agencies without any attendant publicity.

5. Plaintiff did not ask for a declaratory judgment with respect to the Act as a whole nor with respect to §§ 4, 10, 12, 15, 16 and 17.

1. Even though, under the circumstances, I believe that injunctive relief is not warranted, I do not subscribe to the view, apparently held by the majority, that the "anti-injunction statute," 28 U.S.C. § 2283, applies before a state lawsuit has commenced, that is, before an indictment has been obtained. *Cf.* Dombrowski v. Pfister, 380 U.S. 479, 484, n. 2, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1964).

2. That court comprised Judges Winter, Thomsen and Sobeloff.

had invalidated. 287 F.Supp. 61, 64–65 (D.Md.1968).

My brethren, however, seek to evade the effect of the *Whitehill* remand by drawing a distinction between "loyalty" and "sedition" provisions and by maintaining that *Whitehill* spoke only to the former. I perceive no such distinction. The operative words and definitions addressed in *Whitehill* and contained in the so-called "loyalty" sections recur in the other provisions. Moreover, there is no hint in our former opinion that the discussion of severability was so restricted.

> Plaintiff had asked that we declare Article 85A unconstitutional in its entirety, because it is an interwoven statute largely dependent upon the unconstitutional definitions found in § 1 thereof, and such provisions that do not directly refer to or make reference to § 1, or the other unconstitutional provisions, are not severable.

*Id.* at 62,

The court agreed in substance and wrote that

> In short, so much of the original Maryland scheme has been frustrated that we think the presumption of severability has been destroyed.

*Id.* at 65.

We did invalidate the oath provisions and the definitions of "subversive person," "subversive organization" and "foreign subversive organization." However, we declined to enter a sweeping final judgment covering the entire Act because, and only because as the opinion makes eminently clear, plaintiff lacked the requisite standing to contest the parts of the Act not pertaining to him. *Id.* at 65.

The *Whitehill* remand now obligates us to grant full declaratory relief. Plaintiff in the present case, unlike the plaintiff in *Whitehill,* has a direct interest in the attacked portions of the Ober Act and thus properly calls into question the validity of those sections. We are bound by the express holding upon the remand of *Whitehill* that the Ober Act is not severable. Having thrown out the oath provisions and definitional sections in *Whitehill* and having invalidated even more of the Act today, our duty is plain and compelling—to set the discredited Ober Act to rest for once and for all.

## II.

A particularized consideration of the sections that the majority leaves undisturbed also persuades me of their invalidity.

*Sections 2(a) and 2(c).*

Section 2(a) makes it a felony to

> [c]ommit, attempt to commit, or aid in the commission of any act intended to overthrow, destroy or alter, or to assist in the overthrow, destruction or alteration of, the constitutional form of the government of the United States or of the State of Maryland * * * by revolution, force, or violence.

Applying the standard of whether "men of common intelligence [would] speculate at their peril on its meaning" the Supreme Court held, in *Whitehill,* that even after Shub v. Simpson, 196 Md. 177, 76 A.2d 332 (1950), the alteration clause was "still befogged." As the Supreme Court viewed the language found in § 13, the prohibition on "alteration of the constitutional form of the Government * * * by revolution, force, or violence" could be read to cover peaceful revolution or change by non-violent means. Thus, § 13 was declared to be unconstitutionally vague.

The infected language is also found in § 2(a). It is true, as the majority points out, that § 2(a) explicitly purports to cover only acts and not speech. However, that aspect does not immunize § 2(a) from attack. Because of its vagueness, § 2(a) arguably applies to acts of peaceful alteration of the government. These political acts are among the most zealously protected by the federal constitution. Some could indeed be deemed the exercise of speech. Others are shielded by the right of assembly, the right to petition for redress of

grievances, or the right to avail of the political machinery for change that is built into the Constitution itself. This was recognized by the Supreme Court in *Whitehill*. As Mr. Justice Douglas wrote,

> If the Federal Constitution is our guide, a person who might wish to "alter" our form of government may not be cast into the outer darkness. For the Constitution prescribes the method of "alteration" by the amending process in Article V; and while the procedure for amending it is restricted, there is no restraint on the kind of amendment that may be offered. Moreover, the First Amendment, which protects a controversial as well as a conventional dialogue (Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131), is as applicable to the States as it is to the Federal Government; and it extends to petitions for redress of grievances (Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697) as well as to advocacy and debate.

389 U.S. at 57, 88 S.Ct. at 185.

Manifestly, then, a statute which by its vagueness impinges on peaceful political activity is void on its face. For that reason, § 2(a) must be declared invalid.[3] Section 2(c), which prohibits conspiracy to commit the acts banned by § 2(a), is similarly void.

*Section 2(b)*

The same fate must befall § 2(b) which, like 2(c), also depends on § 2(a). Section 2(b) makes it a crime to advocate the acts spelled out by § 2(a) "un-der circumstances as to constitute a clear and present danger to the security" of the government.

There are two indispensable elements of a valid prohibition on advocacy. On the one hand, the proscribed speech must urge conduct that itself may constitutionally be condemned. In addition, there must be substantial imminence of action flowing from the speech. The rule was first articulated by Mr. Justice Holmes in Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). He said that

> the question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.

249 U.S. at 52, 39 S.Ct. at 249.

More recently the Supreme Court has held that advocacy, to fall under a constitutionally permissible ban must amount to "incitement to imminent lawless action." Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Under either version, and under Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) as well, the apprehended "substantive evil" must be one that could validly be prohibited.

The "clear and present danger" test embodied by § 2(b) relates to only one of the constitutional requisites. In the other respect the statute is fatally deficient. Section 2(b) punishes the advocacy of acts which, under the vague definition of § 2(a), could comprise activity that is constitutionally protected. No-

---

3. To bolster its argument for inaction the majority states that

> [a]t the very least, the Maryland courts should be given an opportunity to construe § 2(a) and probably thereby avoid any constitutional question.

The majority's position is that it would be appropriate to abstain from passing on this portion of the Ober Act on the supposition that the state courts might somehow evolve a construction that would save it. Abstention in this case, how-ever, would be most improper. We are dealing with a statute that is almost twenty years old. The state court has already construed it. The Supreme Court, asked to review §§ 1 and 13, did not hesitate to do so. Since then there has been no further legislative or judicial attempt to cure the deficiencies of the Act. Under these circumstances there can be no justification for federal abstention.

where has it been held that the insertion of a "clear and present danger" test saves a statute which bans advocacy of acts which are not legislatively prohibitable. Thus, since § 2(b) depends on § 2(a) for the delineation of the exhorted and ultimately feared acts, it suffers from the same constitutional infirmity.

The majority relies on *Dennis, supra,* to sustain § 2(b). But the Supreme Court has already explicitly rejected such an argument. In Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L. Ed.2d 377 (1964), the Court confronted an oath that contained precisely the same form of vagueness complained of here. The Court said,

> The Washington oath goes beyond overthrow or alteration by force or violence. It extends to alteration by "revolution" which, unless wholly redundant and its ordinary meaning distorted, includes any rapid or fundamental change. Would, therefore, any organization or any person supporting, advocating or teaching peaceful but far-reaching constitutional amendments be engaged in subversive activity? Could one support the repeal of the Twenty-second Amendment or participation by this country in a world government?

377 U.S. at 370, 84 S.Ct. at 1321.

The contention that the *Dennis* case counters the vagueness attack, said Mr. Justice White for a majority consisting of seven justices, is "founded on a misreading of § 2 [of the Smith Act] and *Dennis v. United States." Id.* Note 8.

To recapitulate, our conclusion must inevitably be that no part of § 2 is valid. The vagueness of the Ober Act is particularly egregious since its toll is taken on First Amendment freedoms. "Precision of regulation must be the touchstone" in legislation affecting those rights. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). As the Supreme Court has already declared, the Ober Act falls short by that strict standard.

*Sections 6, 7, and 8.*

Sections 6, 7, and 8 relate to the establishment of the office of Special Assistant Attorney General, the collection of information, and the maintenance of records for the enforcement of the Ober Act.

My brethren are persuaded that the same tests are not applied to the gathering of information by the Attorney General that are applied to criminal prosecutions. But in this I think they are mistaken. There is ample provision aside from Article 85A for the general gathering of information in legitimate law enforcement. The only scope for the operation of sections 6, 7, and 8 is to allow the gathering of information and the keeping of records for prosecutions, or more likely, threats of prosecutions, under the other, unconstitutional, sections of the Ober Act.

Still vivid in memory is an episode that occurred some years ago in connection with a large public meeting held in the Lyric Theatre of Baltimore to discuss the topic of "The Church and a Strengthened United Nations." The then Special Assistant Attorney General, sensing "subversion," undertook to gather information. He stationed police agents at the theatre entrance and in the neighborhood to take the automobile license numbers and to snap pictures of those who attended. The agents also entered the theatre to make notes of the speeches and it was later publicly announced that the information gained was "a basis for action." [4] Although nothing came of it, and indeed the Governor rebuked the whole venture, it is impossible to exaggerate the consternation it engendered in the community. No better use of the office having ever been publicly made known or suggested, the lesson of this event should not dispose a court to speculate about the possible legitimate employment of the sections and the office that is created. Of course, a state may ordinarily decide whether or not to continue an office in

4. Baltimore Sun, May 11, 1953.

existence, but when the office is as closely related as this one to the purpose of enforcing the invalid statutory provisions, it becomes imperative upon us to declare its invalidity as well.

### III.

In sum, my brethren are performing major surgery in an attempt to salvage a remnant of a statute that, even by their own recognition, is largely illegal. They acknowledge the invalidity of the oath provisions condemned in *Whitehill*, the § 1 definitions and the other sections that depend upon them, and all references to threats to the security of the national government. It requires a heroic rewriting of the statute to produce anything that would be enforceable. Aside from consideration of the more technical concept of severability (Part I, *supra*), one must ask what is the possible utility of this patchwork.

The proposed doctoring is ill-advised and can be productive of nothing good or useful. If we abandon the plainly unconstitutional portions of the law, what remains cannot, standing alone, become viable in any constitutional pursuit. It is not operative without the overt or covert restoration of the tainted part. I say, the way to get rid of the infection is not to retain sections that in their very origin and nature have been inextricably linked with the provisions the Court today repudiates.

In deciding what relief the plaintiff deserves, the majority has obviously been impressed by the questionable content of this "underground" newspaper. I agree that there is reason for irritation at the newspaper's coarse, irresponsible and phantasmagorical call to "revolution." I also agree that a legitimate Grand Jury investigation into possible offenses against the drug and obscenity laws would not occasion our intervention or concern.

But these considerations simply illustrate the evil of the statute. No legislation may be used as a coverall for prosecution for any kind of offense indiscriminately. In invoking the Ober Act in this case the judge read to the Grand Jury a quote from the newspaper counseling violation of the drug laws. Thus the very genesis of this case points up the wide range of susceptibility of persons to prosecutions under the shadowy contours of the Act for offenses not adverted to nor even in the remotest contemplation of its draftsmen. Our legal system demands that conduct sought to be proscribed as criminal be defined by some specifically drawn statute. If one runs afoul of such a statute, he may be punished. But if no statute covers his conduct he may not be prosecuted—not even under an all-purpose subversion Act.

In oral argument the Attorney General pressed the contention that plaintiff is entitled to no relief since its "hands are unclean." In his words, "they are the kind of people to whom the protection of the law should not be extended simply because, on the other hand, they are turning around and attempting to void law enforcement and to thwart the ends of justice." This is really only a variation on the theme that tolerates Ober Act prosecution for almost any conduct deemed offensive. Whether it be said that plaintiff is subject to prosecution under the Ober Law for nefarious activities generally, or that it may not assert a constitutional right to prevent the invocation of the Act because the plaintiff is unworthy, either formulation demonstrates the vice of the law: the extreme uses to which its amorphous terms can be put.

This is an Act that is uniquely fraught with the possibility of misuse. Declaratory relief should be granted in the full measure of plaintiff's prayer.