Sherrie **BURSEY** and Brenda Joyce
Presley, Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 26479.

United States Court of Appeals,
Ninth Circuit.

June 30, 1972.

Rehearing Denied Oct. 5, 1972.

See also, D.C., 322 F.Supp. 573.

Arne Werchick (argued), Richard J. Massa, Garry, Dreyfus, McTernan & Brotsky, San Francisco, Cal., for appellants.

Robert C. Mardian, Asst. Atty. Gen., James L. Browning, Jr., U. S. Atty., N.D. Cal., Robert L. Keuch, Garvin Lee Oliver, Victor C. Woerheide, Jr., Jerome K. Heilbron, Attys., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before MERRILL, KOELSCH, and HUFSTEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Bursey and Presley, who are members of the staff of *The Black Panther* newspaper, were held in contempt when they refused to answer certain questions propounded by a federal grand jury. Throughout the grand jury proceedings and the proceedings before the district court, the witnesses consistently asserted the First and Fifth Amendments as the bases upon which they refused to answer the grand jury's inquiries. The appeal presents searching questions about the impact of the First and Fifth Amendments in the context of federal grand jury investigations.

The grand jury investigation, of which this appeal is an outgrowth, was triggered by a speech given by David Hilliard, Chief of Staff of the Black Panther Party, during Moratorium Day demonstrations on November 15, 1969. Hilliard delivered the speech in a public park in San Francisco before a large crowd. The speech was televised and widely reported by the news media across the country. In the course of the speech, Hilliard said, "We will kill Richard Nixon." The investigation began as an effort to determine the identity of the persons, if any, to whom Hilliard referred when he said "We" will kill the President. Later, the investigations expanded to include an exploration of potential interference with the armed forces and a general probe of the affairs of the Black Panther Party. As the focus of the inquiry expanded, the subject matter of the investigation has been variously described in the proceedings below as possible violations of 18 U.S.C. §§ 2, 371, 871, 1751, 2387, "and related statutes." (18 U.S.C. §§ 2 (general aid-

ing and abetting statute), 371 (general conspiracy statute), 871 (threats against President and successors to the Presidency), 1751 (presidential assassination, kidnapping, and assault), 2387 (interference with armed forces); "related statutes" were never specifically identified.)

The Hilliard speech was printed in full in the November 22, 1969, issue of *The Black Panther*, a weekly publication that is an official organ of the Black Panther Party. Hilliard's statement about killing the President was quoted in an article by Ora Williams entitled "No Justice in Amerikka" that was published in the December 27, 1969, issue of *The Black Panther*. The Hilliard speech was reprinted in full in the same paper on January 3, 1970. On February 6, 1970, *Life* magazine printed an article about the Panthers illustrated by several photographs of Party members.

Bursey and Presley first appeared before the grand jury on December 10, 1969, at which time they were questioned primarily about the publication of Hilliard's speech in the November 22 issue and about the internal operations of the Panther newspaper. Each answered a few questions and refused to answer the remainder.

On February 25, 1970, they were recalled before the grand jury. At this session, the inquiry focused on the publication of the newspaper issues dated November 22, December 27, and January 3, and on the photographs published in *Life* on February 6. Both witnesses declined to respond to questions relating to the internal management of the paper and to the identification of the persons pictured in *Life*. Both witnesses were also asked if they had any information about a plot to kill the President or the Vice-President and the acquisition of weapons for that purpose. Bursey answered that she had no such information. Presley declined to answer.

On March 4, 1970, the United States Attorney for the Northern District of California filed applications requesting that Bursey and Presley be granted immunity pursuant to 18 U.S.C. § 2514 and be ordered to testify to matters being investigated by the grand jury. Both applications described the subject matter of the investigation as follows:

"This grand jury was inquiring into matters involving presidential assassination and assault, threats to assassinate the President of the United States, and attempts or conspiracies to commit these offenses and to cause others to commit such offenses, in violation of Title 18, United States Code, Section 1751, and also Title 18, United States Code, Sections 2 and 371."

In support of the applications, the Government attached letters from Assistant Attorney General Wilson dated February 13, 1970, authorizing the United States Attorney to seek immunity for these witnesses. The letters stated in part:

"This is with regard to your request to seek a grant of immunity for Brenda Joyce Presley [and Sherrie Bursey] in connection with the grand jury investigation relating to possible violations of Title 18, United States Code, Section 1751 by members of the Black Panther Party . . . ."

In opposition to the application, Presley submitted an affidavit stating that if she were recalled and asked questions about a plan or conspiracy to kill the President and Vice-President and about the acquisition of weapons, she would answer responsively, denying any such knowledge.

Hearings on the applications were held on April 3 and 17, 1970. On May 6, 1970, the court issued an order granting Bursey and Presley immunity under 18 U.S.C. § 2514 and requiring them to answer certain questions which they had been asked by the grand jury on February 25, 1970. The order specifically excluded from the questions to be answered those relating to the identity of persons in the *Life* photographs, and it expressly referred to the questions asked by the grand jury on February 25, 1970.

On May 13, 1970, Bursey and Presley were again called before the grand jury. Presley was asked whether she knew anything of a conspiracy to kill the President or Vice-President or to acquire weapons for that purpose. She answered "No." Presley was also asked about the possession of weapons by Panthers. She answered that she had never heard any discussion of weapons by Panthers, but she refused to answer a question about her seeing weapons at a Black Panther Party meeting. Both Bursey and Presley were again asked questions relating to the publication and distribution of the November 22, December 27, and January 3 issues of the newspaper which contained the Hilliard "threat"[1] against the President. Both witnesses responded that they worked for the Panther paper, but they refused to answer any questions concerning its internal operations. Presley also admitted that she was a member of the Black Panther Party.

Immediately following the May 13 grand jury session, a hearing was held before the district court at which the grand jury sought to have Bursey and Presley ordered to answer the propounded questions and cited for contempt if they refused. At the instigation of counsel for Bursey and Presley, the court deemed the hearing a reopening of the application for immunity, and it allowed the witnesses to put in evidence to establish their First Amendment privileges. The witnesses testified in detail about their activities on *The Black Panther*. Both said that they sometimes gathered news and prepared articles as reporters and that they regularly edited articles prepared by others and assisted in the various phases of publication, including layout and typesetting.

On May 20 the district court issued a protective order declaring that the witnesses "shall not be required to reveal confidential information received, developed or maintained by them as professional journalists" unless and until the Government shows "a compelling and overriding national interest . . . requiring" their testimony.

The May 2, 1970, issue of *The Black Panther* contained an article entitled "To My Black Brothers in Viet Nam," signed by Eldridge Cleaver, Minister of Information of the Black Panther Party. Among the more inflammatory passages of this article is the following:

> "Either quit the Army now or start destroying it from the inside. Anything else is a compromise and a form of treason against your own people. Stop killing the Vietnamese people. You need to start killing the racist pigs who are over there with you giving you orders. Kill General Abrams and his staff, all his officers. Sabotage supplies and equipment or turn them over to the Vietnamese people."

Presley reappeared before the grand jury on May 21, 1970. She testified in detail about her activities on the paper, especially in connection with the issues of November 22, December 27, January 3, and May 2. She explained that her only activities relating to the challenged articles in those issues were editing, typesetting, and proofreading. She testified that John Seale, Masai Hewitt, Sam Napier, Emory Douglas, and David Hilliard had worked on the paper and she said what each did. However, she refused to name the people who regularly worked on the paper or who worked on specific issues.

Both witnesses were recalled by the grand jury on June 4, 1970. Presley again refused to name specific individuals and to identify the roles each played in the publication and distribution of the same issues of the paper. Bursey named all of the members of the Central Committee of the Black Panther Party, generally described their Party func-

---

1. We indicate no view on whether Hilliard's statement was a true threat or merely a kind of crude political hyperbole. (*Cf*. Watts v. United States (1969) 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664; Roy v. United States (9th Cir. 1969) 416 F.2d 874.)

tions and their connection with the operation of the paper, and indicated that the membership of the Central Committee had not changed appreciably since the Party was formed. She also testified that the paper was intended to reflect the platform and program of the Party. She testified that she knew the identity of the persons who were responsible for publishing and distributing the issues dated November 22, December 27, and January 3, but she declined to disclose their identity. For the first time, Bursey was interrogated about the Cleaver article, "To My Black Brothers in Viet Nam," and about the reprint of the article in pamphlet form. She testified that she had nothing to do with the publication of the article. She said that she knew who was responsible for its reprint and its distribution as a pamphlet, but she refused to name those persons.

On August 13, 1970, the grand jury moved that excerpts of both witnesses' testimony be disclosed to their counsel and that the witnesses be compelled to answer the questions that they had refused to answer on June 4, 1970. On August 20, 1970, the district court indicated that it would deny the motion to compel testimony, because the questions infringed the freedoms of press and association guaranteed by the First Amendment. The grand jury was given a continuance to present evidence of a compelling national interest that might outweigh the First Amendment rights involved.

On September 3, 1970, the grand jury filed the affidavit of a special attorney from the Department of Justice who was assisting it. The affidavit listed persons, described as Black Panthers or persons associating with Black Panthers, against whom there were then pending criminal charges in state or federal courts. It quoted an article published by the *New York Times*, dated December 14, 1969, in which Hilliard is quoted as saying: "We advocate the very direct overthrow of the government by way of force and violence." The affidavit quoted from the Cleaver article from the May 2 issue of *The Black Panther* and had annexed to it as exhibits various articles from the Panther newspaper and from other newspapers describing the Panthers. The articles from *The Black Panther* were those previously described, together with other stories containing revoluntary exhortations by Panther leaders, instructions on the use of firearms, and, in one instance, a description of the manufacture of a Molotov cocktail. The articles from papers other than *The Black Panther* reported violent confrontations between Panthers and police in several cities.

The district court decided that the affidavit "established a compelling and overriding national interest to which the conflicting constitutional rights of the respondents must give way." (In re Grand Jury Witnesses (N.D.Cal.1970) 322 F.Supp. 573, 578.) The court described the subject matter of the grand jury investigation as an inquiry into possible violations of 18 U.S.C. §§ 371, 871, 1751, 2387, and "related statutes." (*Id.* at 577.) The court ordered Bursey and Presley to answer all questions asked of them at the session held June 4, 1970, and to answer "all other questions which are relevant to the said Grand Jury's investigation."

■ The witnesses were recalled before the grand jury on September 10, 1970. They refused to answer the following questions in the described lines of interrogation:

*Questions Bursey Refused to Answer*

A. Questions about the current operation and distribution of the Panther newspaper.

1. Name the people who edit the paper.

2. Name the people who normally work on the newspaper.

3. Name the person who is the current editor-in-chief of the newspaper.

4. Name the person currently responsible for distributing the newspaper.

5. Name the people besides yourself who do layout work for the paper.

6. What kind of persons have been distribution manager recently?

7. Name some of the people who work on the staff of the Black Panther Distribution Manager.

B. Questions concerned with the November 22, December 27, January 3, and May 2 issues of the Panther newspaper together.

8. Name some people who worked on any of these issues.

9. Name the person responsible for distributing any of these issues.

10. Name the person or persons who worked on subscriptions and distribution of these issues.

11. Name some of the people with whom you have gone through articles in the course of deciding if particular articles should be published in these issues.

12. Did John Seale work on any of these issues of the newspaper?

C. Questions related to the Cleaver article, "To My Black Brothers in Viet Nam," which appeared in the May 2 issue of the Panther newspaper and in pamphlet form.

13. Name the person responsible for putting the pictures around the Cleaver article in the May 2 issue of the paper.

14. Name the person responsible for distributing the pamphlet.

15. Name the person with whom you would have to clear if you wanted to put out a pamphlet.

16. Name a person who would know if Panther pamphlets were sent overseas.

D. Questions related to the identity of persons pictured in *Life* magazine of February 6, 1970.

17. Name the people in a particular photograph.

18. Name the woman at the far right side of a particular photograph.

19. Name the people in a particular picture.

20. Name the man at the far right of a particular photograph.

E. Questions about the Panthers generally and their activities.

21. Name the members of the Black Panther Party Central Committee.

22. Name some of the Panthers who have traveled overseas.

23. Name the Panthers who have visited Algeria.

24. Does Albert Howard regularly travel back and forth from Algeria to the United States?

*Questions Presley Refused to Answer*

A. Questions about the November 22, December 27, and January 3 issues of the Panther newspaper.

1. Name the people who worked on the November 22 issue of the newspaper.

2. Name the people who worked on the December 27 issue of the newspaper.

3. Name the people who worked on the January 3 issue of the newspaper.

4. Did John Seale work on all three of these issues of the newspaper?

5. Did Masai Hewitt work on all three of these issues of the newspaper?

6. Did Sam Napier work on all three of these issues of the newspaper?

7. Did Junior Hilliard work on all three of these issues of the newspaper?

8. Did Emory Douglas work on all three of these issues of the newspaper?

9. What was John Seale's job on the newspaper at the time these three issues of the newspaper were published?

10. What was Junior Hilliard's job on the newspaper at the time these three issues were published?

11. What was David Hilliard's job on the newspaper at the time these three issues were published?

12. What was Emory Douglas' job on the newspaper at the time these three issues were published?

B. Question about the May 2 issue of the Panther newspaper which contained

the Cleaver article, "To My Black Brothers in Viet Nam."

13. Name the people who helped put out this issue of the newspaper.

C. Question about the present operation of the Panther newspaper.

14. Name the people who worked on the issue of the Panther newspaper which came out yesterday (September 9, 1970).

D. Questions about the Panthers generally and their activities.

15. Have you ever seen any member of the Black Panther Party in possession of a firearm?

16. Have you ever seen any explosives at any Panther headquarters?

17. Have you ever seen any Molotov cocktails at any Panther headquarters?

18. Have you ever heard any discussion by any member of the Black Panther Party concerning the use of explosives?

19. Have you ever heard any discussion by any member of the Black Panther Party concerning the use of any weapons?

20. Have you ever attended Black Panther Party meetings where the use of weapons or explosives was discussed?

21. If you did attend such meetings, where were they held?

22. If you did attend such meetings, what was the purpose of the use of such weapons or explosives?

23. If you did attend such meetings, was there any discussion about a threat against the President?

24. If you did attend such meetings, was there any discussion concerning either the assaulting, kidnapping, or execution of the President?

25. If you did attend such meetings, was there any discussion about killing any state or federal judge?

26. Do you know anything about the Black Panther Party "going underground"?[2]

27. Do you know where the Party leaders get funds to travel?

28. Do any funds which are used for travel by Party leaders come from any foreign government?

29. Do you know whether any of the funds used for travel by Party leaders come from any foreign government?

30. Do you know whether any Black Panthers have been in contact with representatives of the Palestine Liberation Front or the Al Fatah movement?

31. Have any Black Panthers contacted the Palestine Liberation Front or the Al Fatah movement in connection with getting guerrilla training?

32. Do you know anything about instructions being given to the members of the Black Panther Party in guerrilla warfare?

At the same grand jury session, both witnesses answered responsively a great many other questions. A brief review of some of their responsive answers is necessary to place in context the questions that each declined to answer.

Immediately after Bursey refused to answer the question about the identity of the editor-in-chief (question 3), this colloquy occurred:

"Q. Do you know the current editor-in-chief?

A. Well, we—it's not put editor and chief of the newspaper.

Q. Who is the person primarily responsible for getting the newspaper out?

---

2. Superficially, the personal knowledge of the witnesses is entirely irrelevant to the grand jury's investigation. (*See* Grudin v. United States (9th Cir. 1952) 198 F.2d 610, 612.) Read in context, however, such questions were preliminary, and for purposes of this opinion we have treated them as if they were directed toward the underlying information. If the grand jury could require the witnesses to disclose the underlying information, it can, of course, require answers to preliminary questions. If it could not require disclosure of the ultimate facts, it could not probe the knowledge of these witnesses about those facts.

A. All of us who work on the paper."

Bursey refused to identify the persons responsible for distributing the paper (questions 4, 6), but, during her interrogation about the *Life* photographs, her testimony was as follows:

"Q. The person who I am pointing to now is the person who appears in the extreme left, as you face the picture. Isn't that Mr. Sam Napier?

A. Yes.

Q. Doesn't he have something to do with putting the paper—

A. No.

. . . .

Q. You interpreted my question to have something to do with actually putting the paper in terms of layout and that sort of thing, and he's the national distribution manager, is he not?

A. I think he still is. I'm not sure.

Q. You're not sure?

A. No. It's changed back and forth recently. I'm not sure if he is or not."

Although Bursey declined to describe the details of publication of the paper (questions 1–12), she testified that she did not remember who worked on the issues dated November 22, December 27, and January 3, and that those persons might be some of the same people who were currently working on the paper.

She refused to identify some of the persons who were pictured in *Life* (questions 17–20), but she did identify herself as one of the persons photographed. She also identified the background as the print shop for the newspaper, said that the pictures might have been taken about November 22, 1970, and indicated that some of the persons photographed were members of the Black Panther Party.

Presley testified that the people who worked on the September 9, 1970, issue were "just about the same people who worked on previous papers."

At the contempt hearing on September 17, 1970, counsel for Bursey and Presley reasserted their contentions that the First and Fifth Amendments shielded them from contempt and argued that the information attempted to be elicited by the questions that each had refused to answer was not relevant to the grand jury investigation. The district court held that all of the questions were relevant to the grand jury investigation, rejected the witnesses' constitutional arguments, and ordered the witnesses to answer all of the questions. When they indicated their continued refusal to answer, the court found them in contempt and ordered them committed to custody until either the witnesses purged themselves of contempt or the term of the grand jury expired.[3]

The principal questions presented by the appeal are these: (1) Does the Fifth Amendment privilege against self-incrimination apply to shield the witnesses from responding to any or all the questions that each declined to answer? (2) What limitations, if any, does the due process clause of the Fifth Amendment impose upon the power of a district court to commit a witness to custody for refusal to answer questions propounded by a federal grand jury? (3) Do the governmental interests involved in this grand jury investigation override the freedoms of press and associational, personal, and political privacy secured by the First Amendment and asserted by the witnesses in refusing to answer the questions of the grand jury? (4) Is the appeal moot?

## I. SELF-INCRIMINATION

■■ Neither witness could invoke her Fifth Amendment privilege against self-incrimination to avoid answering questions that might incriminate anyone other than herself. (Rogers v. United

---

3. Neither event occurred, but the district court released both witnesses from custody pending appeal pursuant to Rule 35, Fed.R.Crim.Proc., 18 U.S.C., and Rule 60(b)(5), (6), Fed.R.Civ.Proc. 28 U.S.C.

**1072**

States (1951) 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344; Hale v. Henkel (1906) 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652.) Although all of the questions that Bursey and Presley refused to answer concerned their knowledge of the identity and acts of others, they could assert their privileges because responsive answers might have incriminated them. The purpose of the investigation was to determine whether or not the publication and distribution of certain articles in the Panther newspaper and pamphlets and certain activities of Black Panther Party members were part of a scheme of unlawful conduct. Testimony by the witnesses which revealed their knowledge of the intimate details of such possibly criminal activity would necessarily cast suspicion upon them and could have provided "a link in the chain of evidence needed in a prosecution" of themselves. (Blau v. United States (1950) 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170; Emspak v. United States (1955) 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997; United States v. Burr (C.C.Va.1807) 25 Fed.Cas. 38, 40.) The witnesses, therefore, could rely upon their privileges unless the privileges were nullified by the grants of immunity.

Section 2514[4] provides the witnesses with full transactional immunity. (Carter v. United States (9th Cir. 1969) 417 F.2d 384, cert. denied (1970), 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807, rehearing denied, 400 U.S. 855, 91 S.Ct. 27, 27 L.Ed.2d 93; In re Vericker (2d Cir. 1971) 446 F.2d 244; December 1968 Grand Jury v. United States (7th Cir. 1970) 420 F.2d 1201, cert. denied sub nom. Di Domenico v. United States, 397 U.S. 1021, 90 S.Ct. 1260, 25 L.Ed.2d 531.) Nevertheless, the witnesses argue that the immunity grants were not coextensive with their Fifth Amendment privileges because the grand jury inquiries extended beyond the immunity granted to them.

Section 2514 imposes four conditions upon obtaining a grant of immunity: (1) A United States Attorney must decide that the public interest will be served by immunizing a witness; (2) the application must be approved by the Attorney General; (3) the application must relate to a "proceeding . . . involving any violation of this chapter [119] or any of the offenses enumerated in section 2516," or conspiracies to commit such offenses; and (4) the application must be granted by court order. Thereafter, the witness cannot be prosecuted or subjected to any penalty "on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify."

If the subject matter of a grand jury investigation does not materially change from that described in an immunity grant under section 2514, there is no in-

---

4. 18 U.S.C. § 2514:

"Whenever in the judgment of a United States attorney the testimony of any witness, or the production of books, papers, or other evidence by any witness, in any case or proceeding before any grand jury or court of the United States involving any violation of this chapter or any of the offenses enumerated in section 2516, or any conspiracy to violate this chapter or any of the offenses enumerated in section 2516 is necessary to the public interest, such United States attorney, upon the approval of the Attorney General, shall make application to the court that the witness shall be instructed to testify or produce evidence subject to the provisions of this section, and upon order of the court such witness shall not be excused from testifying or from producing books, papers, or other evidence on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. No such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except in a proceeding described in the next sentence) against him in any court. No witness shall be exempt under this section from prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion as provided in this section."

herent conflict between the provisions of the statute authorizing a grant of immunity and the provisions defining the breadth of the immunity that has been conferred. The statutory interpretation problem arises when an investigation expands to include subject matter in respect of which the witness either could not have been or was not immunized by the terms of the grant.

Relying upon the contradictory inferences inherent in this statute, the parties to this appeal have adopted opposite and extreme positions in defining the permissible range of grand jury inquiry pursuant to a grant of immunity. Focusing upon the limitations imposed upon the use of this statute to compel testimony, the witnesses argue that the grand jury inquiry pursuant to the granted immunity should be strictly limited to questions specifically detailed in the court order granting immunity, or, in the alternative, that when granting immunity under this section, the district court should be required to define clearly the limits of permissible inquiry. The Government relies upon the broad language of the immunity grant in the statute for its position that immunity once granted to a witness applies to any inquiry which a grand jury may thereafter make of the witness.

Neither of these interpretations of section 2514 is acceptable. The first would impede the flow of testimony that Congress intended to release through the use of immunity under section 2514. The second impermissibly extends the scope of the immunity that Congress authorized in this statute.

■■ The district court is not empowered to control the course of a grand jury investigation. In passing upon an immunity application, the court is confined to an examination of the application and the documents accompanying it for the purpose only of deciding whether or not the application meets the proce-

dural and substantive requirements of the authorizing statute. (In re Russo (9th Cir. 1971) 448 F.2d 369; cf. Ullmann v. United States (1956) 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511.)

■ In making their argument, the witnesses, in effect, ask us to require the district court to rule on the relevancy of grand jury questions directed to an immunized witness before the questions are propounded. Were we to adopt their argument, we would fundamentally alter the nature of grand jury proceedings, and we would create intolerable procedural difficulties. In an investigatory process, one question leads to another. The district court could not effectively confine the grand jury to a script without constantly monitoring the investigation—a result that can be squared neither with the functions of a grand jury nor with the functions of the court in the context of a grand jury investigation. To the extent that relevancy is an issue in the context of grand jury inquiry of an immunized witness, it is properly raised when the witness is summoned before the court for failure to comply with the order compelling testimony. (In re Bart (1962) 113 U.S. App.D.C. 54, 304 F.2d 631, 637 n.18; cf. Cobbledick v. United States (1940) 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783.)

■ On the other hand, nothing in the text or legislative history of section 2514 suggests that Congress intended that a witness who had been immunized in connection with a grand jury proceeding involving a specific offense or offenses would be impliedly immunized in respect of any inquiry to which the grand jury might thereafter address itself. The language of the statute reflects the intent stated in the Senate Report that immunity would be available only in connection with the investigation of certain enumerated offenses.[5] There

5. "Section 2514 of the new chapter provides for the granting of immunity from prosecution *in the investigation of viola-* *tions of the chapter and the offenses enumerated in section 2516.* Since unlawful electronic surveillance is typically

would have been little point in specifying the proceedings in which immunity could be granted if the specification were simply the prelude to unrestricted immunity.

■ To interpret section 2514 as giving discretion to the grand jury to expand the scope of an immunity grant by undertaking an inquiry substantially removed from that for which the witness was immunized would reduce to an empty formality the statutory conditions of prior determination by a United States Attorney and prior approval by the Attorney General.[6] In this case, for exam-

ple, the application for immunity by the United States Attorney and the approval of the Attorney General refers to an investigation of possible violations of 18 U.S.C. § 1751 (presidential assassination, kidnapping, and assault), but the grand jury inquiry expanded to encompass possible violations of 18 U.S.C. § 2387 (interference with the armed forces). The United States Attorney or the Attorney General might have decided that the evidence of Bursey's and Presley's possible involvement in the latter offense was so strong that the public interest would not be served by granting

---

a clandestine crime, often committed by an individual at the instigation of another person, the usual techniques of criminal investigation will not, as in organized crime investigations, be adequate to enforce the prohibitions of the statute. The privilege against self-incrimination would work in most cases to prevent the principals behind the overt acts of others from being held legally accountable. Consequently, an immunity grant will be necessary to enforce effectively the prohibitions of the statute and safeguard privacy. Under the proposed section, the grant of immunity would have to be approved by the Attorney General and would be effective only upon an order of the court. The provision is patterned after provisions in other laws which have been upheld and found effective. It is intended to reflect existing law. (Ullmann v. United States, 76 S.Ct. 497, 350 U.S. 422 [100 L.Ed. 511] (1956), upholding 18 U.S.C. 3486 (1964), as amended, 18 U.S.C. 3486(c), (Supp. 1, 1965); Reina v. United States, 81 S.Ct. 260, 364 U.S. 507 [5 L.Ed.2d 249] (1960), upholding 18 U.S.C. 1406 (1964))." S.Rep.No.1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin. News, pp. 2112, 2184. (Emphasis added.)

Section 2514 was enacted as part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968. Title III primarily concerns wiretapping, declares it to be illegal unless authorized and establishes standards for such authorization.

There is very little in the legislative history about immunity. As originally passed in the House, the bill contained none of the final provisions of Title III. In the Senate, the House version (H.R. 5037 and S. 917) was considered by the Judiciary Committee together with a

separate wiretap bill (S. 677) introduced by Senators McClellan and Hruska. Neither bill had an immunity provision. While hearings were being held, Berger v. New York (1967) 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 was decided, and Senator Hruska introduced a new wiretap bill to meet the requirements of that decision. The bill was referred to the Judiciary Committee and added to those under consideration. It contained a section authorizing immunity in connection with investigations of illegal wiretapping. During the Committee's consideration of the bills, this section was amended to the present form of § 2514 by adding a cross reference authorizing immunity in connection with investigations of all the offenses listed in 18 U.S.C. § 2516 in addition to illegal wiretapping. We have been unable to find anything in the published hearings on these bills to explain the amendment. The congressional debates prior to enactment are equally unenlightening. Indeed, the only specific references to § 2514 which we have been able to find imply that some Senators may have acted under the mistaken impression that the immunity of § 2514 was still confined to investigations of illegal wiretapping. (See 114 Cong.Rec. 14745–46; S.Rep.No.1097, supra.)

6. The immunity application in this case were approved by Will Wilson, then Assistant Attorney General in charge of the Criminal Division, apparently pursuant to a delegation by the Attorney General of the power committed to him by § 2514. (United States v. Di Mauro (8th Cir. 1971) 441 F.2d 428, 438–439; United States v. Puntillo (7th Cir. 1971) 440 F.2d 540, 544; December 1968 Grand Jury v. United States, supra, 420 F.2d at 1203.)

them immunity, or one of them might have determined that granting immunity in connection with an investigation under that statute would unnecessarily infringe upon the rights of the witnesses by affixing immunity to their testimony when it was unlikely that helpful information would be obtained. The statute places the burden of the determination on a United States Attorney and the Attorney General; it confers no such discretion upon the grand jury. (In re Grand Jury Investigation (E.D.Pa.1970) 317 F.Supp. 792, 796, motion denied (3d Cir.) 427 F.2d 714; cf. In re Bart, supra, 304 F.2d at 635.)

■ Section 2514 gives no authority to an attorney who is assisting a grand jury to extend the scope of an immunity grant by broadening the area of his interrogation of an immunized witness. Such authority should not be implied, because it would undermine the statutory checks that Congress imposed upon grants of immunity. The Senate Report on section 2514 indicates that the provisions of the statute requiring action by a United States Attorney and by the Attorney General was modeled after existing law. (See note 5 supra.) An immunity statute that appears to be the model was former 18 U.S.C. § 3486(c), P.L. 83–600, Aug. 20, 1954, 68 Stat. 745, repealed, P.L. 91–452, Oct. 15, 1970, 84 Stat. 930, imposing the same requirements. The legislative history of section 3486(c) reveals that one of the purposes for including dual action was to guard against "immunity baths" by requiring "at least two other independent but interested parties who must concur in the grant of immunity." (H. R.Rep.No. 2606, 83d Cong., 2d Sess., 1954 U.S.Code & Admin.News, pp. 3059, 3064–3065; cf. Corona v. United States (6th Cir. 1958) 250 F.2d 578, cert. denied, 356 U.S. 954, 78 S.Ct. 921, 2 L.Ed. 2d 847, rehearing denied, 356 U.S. 978, 78 S.Ct. 1140, 2 L.Ed.2d 1152; United States v. Brennan (1954) 94 U.S.App. D.C. 184, 214 F.2d 268, cert. denied, 348 U.S. 830, 75 S.Ct. 53, 99 L.Ed. 655.)

Section 2514 should be construed to avoid the difficulties posed by the interpretations offered by the parties. It should be applied in a manner that will accommodate the needs of a grand jury and of the immunized witness without unduly impairing the investigatory power of the grand jury or the rights of the witness.

■ A court is not "entitled to set limits to the investigation that a grand jury may conduct." (Blair v. United States (1919) 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979; United States v. United States District Court (4th Cir. 1956) 238 F.2d 713, cert. denied sub nom. Valley Bell Dairy Co., Inc. v. United States (1957) 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365.) However, neither the issuance of a grant of immunity nor the interpretation of the immunity grant is any part of the function of a grand jury. The issuance of immunity is initially committed to prosecutorial discretion operating within the limits that Congress imposed and later to the court interpreting congressional will and the commands of the Constitution.

■ The court first becomes concerned with the substance of the inquiries to a witness when the grand jury seeks an order compelling the witness to respond to questions that he has refused to answer despite a prior grant of immunity. When the basis of the witness' declination is the assertion of his Fifth Amendment privilege, the court must (1) interpret the grant of immunity to identify the specific investigation for which the witness was immunized under section 2514, and (2) determine the relationship if any, between the investigation for which he was immunized and the challenged questions. If the subject matter of the interrogation to which he refused to respond is not related to the investigation for which he has been validly immunized, the witness cannot be forced to answer. (Carter v. United States, supra, 417 F.2d at 388; In re Vericker, supra, 446 F.2d 244; United States v. Di Mauro, supra, 441 F.2d at

438; *cf.* Ullmann v. United States, *supra*, 350 U.S. at 426, 76 S.Ct. 497; In re Grand Jury Investigation of Giancana (7th Cir. 1965) 352 F.2d 921, cert. denied sub nom. Giancana v. United States, 382 U.S. 959, 86 S.Ct. 437, 15 L. Ed.2d 362; United States v. Shillitani (2d Cir. 1965) 345 F.2d 290, vacated on other grounds (1966) 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622; United States v. Tramunti (2d Cir. 1965) 343 F.2d 548, vacated on other grounds sub nom. Castaldi v. United States (1966) 384 U.S. 886, 86 S.Ct. 1906, 16 L.Ed.2d 993; United States v. Harris (2d Cir. 1964) 334 F.2d 460, rev'd on other grounds (1965) 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240; United States v. Testa (3d Cir. 1964) 326 F.2d 730, 732–734 (dissenting opinion to petition for rehearing), cert. denied sub nom. Testa v. United States, 376 U.S. 931, 84 S.Ct. 701, 11 L.Ed.2d 652; In re Bart, *supra*, 304 F.2d at 637; United States v. Chas. Pfizer & Co. (S.D.N.Y.1965) 245 F. Supp. 801, 817–818).

■■■ The nexus between the questions that the witness refused to answer and the subject matter for which he has been immunized is not established by showing that the inquiries were relevant to the matter the grand jury is investigating, unless that matter is substantially confined to the subject named in the immunity grant. There is no necessary connection between the scope of immunity that has been granted and the scope of a grand jury investigation. The issue is not: Was a question relevant to the subject that the grand jury is investigating? The issue is: Was a question relevant to the subject with respect to which the witness was granted immunity? Almost any question may be relevant to the subject matter of the grand jury investigation, but not all such questions are necessarily relevant to the investigation for which immunity has been granted.

■■■ The grand jury, not the court, decides what it shall investigate, which witnesses shall be called, and how the witnesses shall be interrogated. The court, not the grand jury, decides whether specific questions which the grand jury wants answered fall within or without the grant of immunity authorized by section 2514. We hold that the court cannot compel a witness immunized under section 2514 to answer incriminating questions that are not related to the subject matter for which he was granted immunity.[7]

■■■ The standard of relevance that is to be applied cannot be defined precisely. We recognize that the concepts of relevance used in ordinary litigation do not fit a grand jury investigation. Greater flexibility must be allowed grand jury inquiries to accommodate the differences between a trial and an investigation. (See Carter v. United States, *supra*, 417 F.2d at 384; cf. United States v. Tramunti, *supra*, 343 F.2d at 552; United States v. Harris, *supra*, 334 F.2d at 462–463.) We think that the minimum standard of relevancy to be applied in deciding whether an immunized witness can be compelled to answer specific questions posed by the grand jury is this: If there is nothing in the record before the district court that suggests a logical connection between the subject of the question and the subject matter of the investigation for which the witness received immunity, the question shall be deemed to elicit testimony that is irrelevant, and the witness cannot be compelled to answer it.

■■■ The burden rests on the grand jury to show that the questions that the witness has refused to answer are relevant to the investigation for which he has been granted immunity. (In re Vericker, *supra*, 446 F.2d at 247–248.) It has the ammunition to meet this challenge, and the witness does not. Aside

---

7. In United States v. Weinberg (9th Cir. 1971) 439 F.2d 743, 749–750, the distinction between relevancy of questions to a grand jury investigation and relevancy of questions to the investigation for which immunity was granted was neither raised nor discussed.

from his own testimony, the witness does not know what evidence has been received by the grand jury or what evidence will be later produced by the attorneys assisting the grand jury. Absent disclosure to the district court, the grand jury and those assisting it alone know the foundation that has been laid for the testimony sought and the destination toward which the questioning leads.

■ If it appears that the necessary exploration of relevance may impair the secrecy of the grand jury proceeding, protection may be achieved by *in camera* disclosure to the district court. Of course, any disclosure encroaches in some measure on the secrecy of the proceeding, but some modest security breaches should be tolerated in situations in which competing interests outweigh the interests of preserving secrecy. (Mara v. United States (7th Cir. 1971) 454 F.2d 580, petition for cert. filed, 40 U.S.L.W. 3316 (Dec. 30, 1971); *cf.* Alderman v. United States (1969) 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, rehearing denied sub nom. Ivanov v. United States, 394 U.S. 939, 89 S.Ct. 1177, 22 L.Ed.2d 475; Dennis v. United States (1966) 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973; Allen v. United States (1968) 129 U.S.App.D.C. 61, 390 F.2d 476; United States v. Youngblood (2d Cir. 1967) 379 F.2d 365.)

■ The limitations thus imposed on immunity granted under section 2514 do not seriously threaten a witness who, misled by the grant of immunity, provides incriminating information about offenses unrelated to the investigation for which he has been immunized. Waiver of the privilege against self-incrimination is not effective unless it is voluntary. (Boykin v. Alabama (1969) 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274; *cf.* Johnson v. Zerbst (1938) 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.) An immunized witness' incriminating statements made in good faith in response to questions posed by the grand jury are not "voluntary." A waiver of the witness' Fifth Amendment

privilege cannot be predicated upon such statements. (Shotwell Mfg. Co. v. United States (1963) 371 U.S. 341, 347–348, 83 S.Ct. 448, 9 L.Ed.2d 357, rehearing denied, 72 U.S. 950, 83 S.Ct. 931, 9 L. Ed.2d 975; Crawford v. United States (5th Cir. 1955) 219 F.2d 207, 210–211, rehearing denied, 220 F.2d 352; Miller v. State (Miss.1971) 250 So. 2d 624; *cf.* Bram v. United States (1897) 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568; Wilson v. United States (1896) 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090.) In this case, the attorneys assisting the grand jury repeatedly reminded Bursey and Presley that they had been immunized, and they extracted from both witnesses responsive and incriminating answers upon subjects that were irrelevant to the offenses for which immunity had been granted. There is not the slightest indication that the witnesses were acting in bad faith when they answered such questions. Under these circumstances, neither witness can be deemed to have waived her Fifth Amendment privilege in respect of those questions and answers that fell within the nonimmunized areas.

We turn to the facts of this case. The witnesses were both granted immunity for an investigation of potential violations of 18 U.S.C. § 1751. The investigation thereafter expanded to include potential violations of 18 U.S.C. §§ 2, 371, 871, 2387, and other unspecified "related statutes." We assume that all of the questions that the witnesses refused to answer were relevant to possible offenses which the grand jury might properly investigate. The issue, is, however, were the questions relevant to an investigation of possible violations of section 1751? The resolution of the issue depends on the further question: Did the grand jury successfully carry its burden of establishing a relationship between the information sought and an investigation of possible violations of section 1751?

■ We think that the grand jury did carry its burden with regard to most

of the questions asked.[8] Questions concerning discussions of killing or kidnapping the President (Presley questions 23, 24) and about discussions and use of firearms or explosives (Presley questions 15–22) on their face are relevant to potential violations of section 1751. The relevancy of questions about the Panthers involvement with foreign governments (Presley questions 28–31) is more doubtful, but, bearing in mind that the questions may have been preliminary and that the standard of relevancy to be applied is less stringent than that in a trial, we conclude that the questions are not too remote from the investigation of potential violations of section 1751.

■ Questions about the identity of the persons who worked on the three issues of the paper dated November 2, December 27, and January 3 (Bursey questions 8–12; Presley questions 1–12) are not on their face relevant. However, the questions were connected to potential violations of section 1751 by prior testimony of the witnesses and by the affidavit of the attorney assisting the grand jury which were presented to the district court. In this manner, the grand jury established that these issues of the paper carried the Hilliard "threat" and that the paper reflected the official policies of the Black Panther Party. The foundation thus laid adequately linked the questions to the immunized investigation for present purposes.

■ Questions about the identity of persons responsible for the present operation of the newspaper (Bursey questions 1–7; Presley question 14) were based upon the testimony of these witnesses that people then working on the paper might have also worked on the November 22, December 27, and January 3 issues and are therefore relevant. The relevancy of questions concerning the identity of persons in the *Life* photographs (Bursey questions 17–20) is supported by other testimony of Bursey

given September 10, 1970, which was presented to the district court. She identified the background of the photographs as the print shop where the paper is prepared, and she said that the pictures might have been taken around November 22, 1969. Similarly, the testimony of Bursey on June 4, 1970, that members of the Central Committee of the Party sometimes worked on the newspaper and that the membership of the Central Committee remained unchanged during the applicable time was a sufficient basis for the grand jury to require her to identify the members of the Central Committee (Bursey question 21).

■ Questions that concerned training Panthers for violent action and the secrecy of the activities of the Panthers (Presley questions 26, 32) are not too remote from possible plots of violent acts against the President to fail our relevance test.

■ On the other hand, the general questions about travel abroad and financing travel by Panthers (Bursey questions 22–24; Presley question 27) are not relevant on their face, and nothing in the record before the district court suggests a logical connection between those questions and a violation of section 1751. The grand jury may have had information that made a connection, but until such foundation is presented, the witnesses cannot be compelled to answer these questions.

■ The questions about publication of the May 2 issue of the newspaper and the pamphlet containing the Cleaver article (Bursey questions 13–16; Presley question 13) were relevant to an investigation of possible violations of 18 U.S.C. § 2387. The problem is that the witnesses were not immunized in connection with an investigation of possible violations of that statute, and the record reveals no sufficient connection between such questions and an investigation of possible violations of section 1751 for

---

8. The discussion in this section of the opinion is confined to the self-incrimination issue. It does not touch the First Amendment problems considered later.

which immunity was granted. It does not logically follow that a person who would know whether Panther pamphlets were sent overseas might also have knowledge of or be involved in a conspiracy to kill the President. Until the grand jury establishes a sufficient connection between the information sought and a possible violation of section 1751, or the witnesses are properly granted immunity for an investigation of possible violations of section 2387, the Fifth Amendment privilege prevents Bursey and Presley from being punished for refusing to answer these questions.

 Presley cannot be compelled to answer the question about plans to kill federal or state judges (Presley question 25). Admittedly, people who are planning one murder may also be planning another, but, standing alone, that is not a sufficient connection to expand the immunity granted to compel an answer to this question. Congressional limitations on the use of immunity to investigations of certain enumerated offenses would be negated if evidence of entirely unrelated offenses were thus brought within the reach of the immunity after it was granted.

 Finally, there were some questions directed to Bursey that simultaneously concerned the three issues carrying the Hilliard speech and the one issue carrying the Cleaver article (Bursey questions 8–12). The form of questions asked by a grand jury is ordinarily immaterial. Here, however, the multifarious questions covered both immunized and nonimmunized subjects. The error in form should be corrected before the court can compel the answers.

## II. DUE PROCESS

Due process questions arise in this case for two reasons: (1) Both witnesses were held in contempt for refusing to answer some questions that they had answered prior to the contempt hearing. (2) Bursey was held in contempt for refusing to answer certain questions that the court had previously held she could not be required to answer.

During the course of her grand jury testimony on September 10, Bursey provided responsive answers to questions 3, 4, 6, and 8–12. She had in substance answered question 21 at the grand jury hearing on June 4. Presley in substance answered questions 4–6, 8, 9, 11, and 12 during her earlier testimony before the grand jury on May 21. She had responded to questions 18–24 in an affidavit submitted in opposition to the immunity application and during her testimony before the grand jury on May 13.

Some repetition in the examination of a witness before a grand jury is inevitable and, under some circumstances, it may even be desirable.[9] Excessive repetition of the same questions upon the same or subsequent appearances of a witness serves no useful purpose. It needlessly prolongs an investigation, and it may permit abuse of the witness.

 Compelling a witness to answer a question to which he has previously responded adds very little to a grand jury's store of information. The risks to a witness confronted by repetitious questions, however, may not be minimal. There is always the hovering possibility that inconsistency in his answers may expose him to prosecution for perjury. The witness may also have to assume the risk that his prior answers may be construed as a waiver of his First and Fifth Amendment rights. (*See* Presser v. United States (1960) 109 U.S.App.D. C. 99, 284 F.2d 233, cert. denied (1961) 365 U.S. 816, 81 S.Ct. 694, 5 L.Ed.2d 696, rehearing denied, 365 U.S. 855, 81 S.Ct. 800, 5 L.Ed.2d 820; In re George F. Nord Bldg. Corp. (7th Cir. 1942) 129 F.2d 173, cert. denied sub nom. Kausal

9. A grand jury, for example, has an appropriate interest in hearing responses to questions about the same matter put in different ways to test the witness' powers of recollection and credibility.

v. 79th & Escanaba Corp., 317 U.S. 670, 63 S.Ct. 75, 87 L.Ed. 538.) [10]

The potential for abuse is considerably enhanced when the witness is recalled again and again and when weeks or months elapse between appearances. The grand jury and the attorneys assisting it can refresh their memories of the witness' prior testimony before each appearance because they have access to the transcripts. The witness cannot aid his recollection by recourse either to a transcript or to the memory of his counsel.[11] He may be obliged to take these risks even though his memory of his prior testimony during the full span of his interrogation has been diminished or extinguished.

 We think that the concepts of fundamental fairness inherent in due process require that a grand jury witness be given some protection from these risks before he is compelled to answer repetitious questions. Minimal protection is afforded by devising a means to give him an opportunity to determine whether or not he has previously answered questions which he now declines to answer. Several methods could be used, none of which is perfect. One method that commends itself to us is modeled after Rule 16(a) of the Federal Rules of Criminal Procedure.[12] Upon motion of a grand jury witness, the court may order the attorney representing the grand jury to permit the witness to inspect, copy, or photograph the witness' recorded testimony before the grand jury. The motion shall be granted unless the attorney representing the grand jury can demonstrate "some particularized and substantial reasons why this should not be allowed in a particular case." (United States v. Projansky (S.D.N.Y.1968) 44 F.R.D. 550, 552.) If the grand jury is able to carry its substantial burden in this regard and the witness' motion is denied, the prior testimony of the witness must be disclosed *in camera* to the district court; and, if it appears to the court that the witness, in substance, may have answered the questions for which compulsory process is sought, the court must disclose such passages in the prior testimony to the witness and his counsel. (*Cf.* Pittsburgh Plate Glass Co. v. United States (1959) 360 U.S. 395, 79 S.Ct. 1237, 3 L. Ed.2d 1323, rehearing denied, 361 U.S. 855, 80 S.Ct. 42, 4 L.Ed.2d 94.) If this procedure is not followed, an order of contempt based upon a refusal to answer repetitious questions will not be sustained.

 A witness may not base a refusal to answer a question on the ground that it is repetitious. The purpose of adopting this disclosure procedure is not to create any new basis for immunity or any new privilege. It is

10. If a court divines that the purpose of repetitious questioning is to coax a witness into the commission of perjury or contempt, such conduct would be an abuse of the grand jury process. (Brown v. United States (8th Cir. 1957) 245 F.2d 549; *cf.* United States v. Thayer (D.Colo. 1963) 214 F.Supp. 929; United States v. Cross (D.D.C.1959) 170 F.Supp. 303; United States v. Icardi (D.D.C.1956) 140 F.Supp. 383).

11. "Laymen cannot be expected to know how to protect their rights when dealing with practical and carefully counseled adversaries . . . ." (Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar (1964) 377 U.S. 1, 7, 84 S.Ct. 1113, 1117, 12 L.Ed.2d 89, rehearing denied, 377 U.S. 960, 84 S.Ct. 1625, 12 L.Ed.2d 505.) Even when witnesses are freely allowed to leave the grand jury room to consult with counsel, as Bursey and Presley were, such assistance may be of limited value. In this case, for example, throughout the proceeding below, counsel for the witnesses were provided with only limited excerpts of their clients' testimony in order to preserve grand jury secrecy. It is doubtful, therefore, whether counsel is even now aware that their clients may have in substance answered certain questions which they were held in contempt for refusing to answer.

12. In pertinent part, Rule 16(a) provides: "Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant . . . recorded testimony of the defendant before a grand jury."

intended to give the witness a fair basis upon which to make an informed choice of answering or declining to answer when the issue is posed in a proceeding to compel him to answer.

██ The second due process problem arises because Bursey refused to answer questions about photographs in *Life* magazine (Bursey questions 17–20), and the district court's order of May 6 granting immunity expressly excepted from the grant questions about the same subject. Whether the district court's original exception was right or wrong, it is a denial of due process to hold a witness in contempt for refusing to answer questions that had been excepted from an immunity grant, at least in the absence of a reversal of that order that has been brought to the witness' attention with unmistakable clarity. Bursey cannot be held in contempt for refusing to answer these questions. (People v. Masiello (1971) 28 N.Y.2d 287, 321 N.Y.S.2d 577, 270 N.E.2d 305, reargument denied, 29 N.Y.2d 646, 324 N.Y.S.2d 467, 273 N.E.2d 318, 320; cf. Brown v. United States (1959) 359 U.S. 41, 50, 79 S.Ct. 539, 3 L.Ed.2d 609, rehearing denied, 359 U.S. 976, 79 S.Ct. 873, 3 L.Ed.2d 843.)

### III. FIRST AMENDMENT

Bursey and Presley rely on the freedoms of press and associational privacy secured by the First Amendment to protect them from being compelled to answer questions about the identity and activities of people who worked on the newspaper and pamphlets or who were members of the Black Panther Party. The Government responds that (1) the information sought is not protected by the First Amendment, (2) the First Amendment does not penetrate a grand jury investigation, (3) even if the First Amendment survived the trip into the grand jury room, the First Amendment interests must yield to the paramount interests of the Government in securing the information it sought to obtain through the questions that the witnesses refused to answer.

The Government first argues that threats to the President and incitements to insubordination in the armed forces are not "speech" protected by the First Amendment and that an investigation into the activities of those who may be connected with such "non-speech" is likewise removed from the insulation of the First Amendment.

Two of the objectives of the grand jury investigation were to determine the existence of potential violations of 18 U.S.C. § 871(a) (threats to the President) [13] and 18 U.S.C. § 2387 (interference with the armed forces),[14]

---

13. Section 871 provides:

(a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any. letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

14. Section 2387 provides:

(a) Whoever, with intent to interfere with, impair, or influence the loyalty, morale, or discipline of the military or naval forces of the United States:

(1) advises, counsels, urges, or in any manner causes or attempts to cause insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States; or

(2) distributes or attempts to distribute any written or printed matter which advises, counsels, or urges insubordination, disloyalty, mutiny, or refusal of duty by any member of the military or naval forces of the United States—

Shall be fined not more than $10,000 or imprisoned not more than ten years,

both of which penalize forms of "pure speech." There is no offense under either statute unless the particular expression read in context falls within the statutory proscription and unless the speaker, printer, or distributor had the specific intent that each statute requires. (Watts v. United States, *supra*, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664; Dunne v. United States (8th Cir. 1943) 138 F.2d 137, cert. denied, 320 U. S. 790, 64 S.Ct. 205, 88 L.Ed. 476, rehearing denied, 320 U.S. 814, 815, 64 S. Ct. 260, 426, 88 L.Ed. 492, 493.)

■ The Government's argument takes as its premise the conclusion to be proved: The expressions and associational relationships in issue are not protected by the First Amendment. This argument implies that there is a presumption of nonprotection applied to the expressions and associations involved in this case and that the witnesses are obliged to overcome it before they can rely on the First Amendment. The Government has it backwards. All speech, press, and associational relationships are presumptively protected by the First Amendment; the burden rests on the Government to establish that the particular expressions or relationships are outside its reach. (*E. g.*, Gooding v. Wilson (1972) 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408; Cohen v. California (1971) 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284, rehearing denied, 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124; Speiser v. Randall (1958) 357 U.S. 513, 78 S. Ct. 1332, 2 L.Ed.2d 1460, rehearing denied sub nom. Prince v. City and County of San Francisco, 358 U.S. 860, 79 S.Ct. 13, 3 L.Ed.2d 95.)

■■ We reject the Government's second contention that the First Amendment is nugatory in a grand jury proceeding.[15] No governmental door can be closed against the Amendment. No governmental activity is immune from its force. That the setting for the competition between rights secured by the First Amendment and antagonistic governmental interests is a grand jury proceeding is simply one of the factors that must be taken into account in striking the appropriate constitutional balance.

There are differences between grand jury investigations and other forms of governmental activity to which the First Amendment has been applied, but none of the differences provides any basis for applying the First Amendment less rigorously to grand jury proceedings.

■ A grand jury is an arm of the judiciary, rather than an appendage of the other branches of Government. The judiciary, no less than its governmental coordinates, is bound by the Constitution. Indeed, it would be anomolous for courts to protect First Amendment rights from infringement by other branches of Government, while providing no such protection from the acts of judicial agencies over which the courts have supervisory as well as constitutional powers. (*Cf.* N. A. A. C. P. v. Alabama (1957) 357 U.S. 449, 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488; Shelley v. Kraemer (1948) 334 U.S. 1, 14–18, 68 S.Ct. 836, 92 L.Ed. 1161.) The grand jury is an investigatory body, but the First Amendment regularly enters investigatory territory. (*E. g.*, Gibson v. Florida Legislative Investigation Comm. (1963) 372 U.S. 539, 83 S.Ct. 889, 9 L. Ed.2d 929; Barenblatt v. United States (1959) 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115, rehearing denied, 361 U.S. 854, 80 S.Ct. 40, 4 L.Ed.2d 93.) Grand jury proceedings are supposed to

---

or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction.

 . . .

15. The Government cites United States v. Weinberg, *supra*, 439 F.2d at 748 to sustain its contention that a witness before a grand jury cannot invoke the protection of the First Amendment to avoid answering questions. The Government reads too much into *Weinberg*. *Weinberg* recognizes that the First Amendment penetrates the grand jury room, but it strikes the balance against the First Amendment rights under the circumstances of that case.

be secret, whereas almost all other governmental activity is not; but the degree of notoriety that attaches to a particular disclosure is merely one of the factors to be considered in determining whether First Amendment rights have been abridged. (*See* N. A. A. C. P. v. Alabama, *supra,* 357 U.S. at 462–463, 78 S.Ct. 1163; Watkins v. United States (1957) 354 U.S. 178, 197–198, 77 S.Ct. 1173, 1 L.Ed.2d 1273; Caldwell v. United States (9th Cir. 1970) 434 F.2d 1081, cert. granted, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109, argued, 40 U.S.L. W. 3405.) [16]

■ When governmental activity collides with First Amendment rights, the Government has the burden of establishing that its interests are legitimate and compelling and that the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests. (*E. g.,* In re Stolar (1971) 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657; United States v. O'Brien (1968) 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672, rehearing denied, 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188; DeGregory v. Attorney General of New Hampshire (1966) 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292; Shelton v. Tucker (1960) 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231.)

■■ When the collision occurs in the context of a grand jury investigation, the Government's burden is not met unless it establishes that the Government's interest in the subject matter of the investigation is "immediate, substantial, and subordinating," that there is a "substantial connection" between the information it seeks to have the witness compelled to supply and the overriding governmental interest in the subject matter of the investigation, and that the means of obtaining the information is not more drastic than necessary to forward the asserted governmental interest. The investigation must proceed "step by step . . . [and] an adequate foundation for inquiry must be laid before proceeding in such manner as" may inhibit First Amendment freedoms. (Gibson v. Florida Legislative Investigation Comm., *supra,* 372 U.S. at 551, 557, 83 S.Ct. at 899, *see also* Shelton v. Tucker, *supra,* 364 U.S. at 487–490, 81 S.Ct. 247.) In laying that foundation the Government is not required to establish that the activities about which the witness has been called to testify are criminal; it does not have to show the result of an investigation to justify conducting it. (*See* Blair v. United States, *supra,* 250 U.S. at 282–283, 39 S.Ct. 468; Hendricks v. United States (1912) 223 U.S. 178, 184, 32 S.Ct. 313, 56 L.Ed. 394.) However, it is obliged to show that there is a substantial possibility that the information sought will expose criminal activity within the compelling subject matter of the investigation.

The Government's third argument is that it succeeded in carrying its burden on each of the questions that the witnesses declined to answer. We disagree.

■■ The First Amendment interests in this case are not confined to the personal rights of Bursey and Presley. Although their rights do not rest lightly in the balance, far weightier than they are the public interests in First Amendment freedoms that stand or fall with the rights that these witnesses advance for themselves. Freedom of the press was not guaranteed solely to shield persons engaged in newspaper work from unwarranted governmental harassment.

16. *See also* Wood v. Georgia (1962) 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569; Goodman v. United States (9th Cir. 1939) 108 F.2d 516, 520; Hammond v. Brown (N.D.Ohio 1971) 323 F.Supp. 326, 349–358, aff'd (6th Cir. 1971) 450 F.2d 480; King v. Jones (N.D.Ohio 1970) 319 F. Supp. 653, rev'd on other grounds (6th Cir.) 450 F.2d 478, vacated as moot (1972) 405 U.S. 911, 92 S.Ct. 956, 30 L.Ed.2d 780; Levin v. Marshall (D.Md. 1970) 317 F.Supp. 169; Anonymous v. Buffalo Courier Exp., Inc. (Erie Co. 1969) 60 Misc.2d 880, 304 N.Y.S.2d 112; cf. Garland v. Torre (2d Cir. 1958) 259 F.2d 545, 548–550, cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (op'n by then Judge Stewart).

The larger purpose was to protect public access to information. Freedom of association was secured not only to protect the privacy of those who assert their rights in litigation, but also to shelter all persons from unjustifiable governmental prying into their associations with lawful groups. In the context of litigation, vindication of these public rights secured by the First Amendment is primarily committed to persons who are also asserting their individual constitutional rights. (*See, e. g.,* Gooding v. Wilson, *supra,* 405 U.S. 518, 92 S.Ct. 1103; Eisenstadt v. Baird (1972) 405 U.S. 438, n. 5, 92 S.Ct. 1029, 31 L.Ed.2d 349; In re Stolar, *supra,* 401 U.S. 28, 91 S.Ct. 713; Gibson v. Florida Legislative Investigation Comm., *supra,* 372 U.S. at 543–544, 83 S.Ct. 889; Bates v. Little Rock (1960) 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480; N. A. A. C. P. v. Alabama, *supra,* 357 U.S. at 458–460, 78 S.Ct. 1163; Barrows v. Jackson (1953) 346 U.S. 249, 254–260, 73 S.Ct. 1031, 97 L.Ed. 1586, rehearing denied, 346 U.S. 841, 74 S.Ct. 19, 98 L.Ed. 361.)

No lesson from history was more indelibly impressed on the draftsmen of the First Amendment than the penchant of governments to stifle criticism by destroying free expression in the name of protecting the internal security of the state. *See* United States v. United States District Court (1972) 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 [decided June 19, 1972]; New York Times Co. v. United States (1971) 403 U.S. 713, 714–720, 91 S.Ct. 2140, 29 L.Ed.2d 822 (Black, J., concurring), 723–724, 91 S. Ct. 2146 (Douglas, J., concurring); T. Emerson, The System of Freedom of Expression 98–100 (1970); Z. Chafee, Freedom of Speech in the United States 497–516 (1941). The draftsmen of the First Amendment were guided by the philosophy so eloquently expressed by John Milton in his famous *Areopagitica*:

"Give me the liberty to know, to utter, and to argue freely according to conscience, above all liberties. . . . Though all the winds of doctrine were let loose to play upon the earth, so Truth be in the field, we do injuriously, by licensing and prohibiting to misdoubt her strength. Let her and Falsehood grapple; whoever knew Truth put to the worse in a free and open encounter?"

Thomas Jefferson echoed Miltonian philosophy when he said:

"The basis of our government's being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers or newspapers without government, I should not hesitate a moment to prefer the latter. But I mean that every man should receive these papers and be capable of reading them." (Letter from Thomas Jefferson to Edward Carrington, Jan. 16, 1787, in XII Papers of Thomas Jefferson (J. P. Boyd ed. 1955) 48–49.)

These rights are the very foundation of a free society. (Shelton v. Tucker, *supra,* 364 U.S. at 485–486, 81 S.Ct 247; Bates v. Little Rock, *supra,* 361 U.S. at 522–523, 80 S.Ct. 412; DeJonge v. Oregon (1937) 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278.)

■■ Questions about the identity of persons who were responsible for the editorial content and distribution of a newspaper and pamphlets (Bursey questions 1–21; Presley questions 1–14) [17] cut deeply into press freedom. Two basic ingredients of press freedom are liberty to decide what to print and to dis-

---

17. All grand jury questions have to be read in the total context in which they are asked. Bursey questions 17–21 on the surface do not seem to involve freedom of press issues. It should be remembered, however, that Bursey had identified the background of the *Life* photographs as the print shop where the paper was prepared and had testified. that members of the Central Committee worked on the paper. In context, therefore, these questions were merely alternative attempts by the grand jury to discover the identity of persons responsible for the publication of the newspaper.

tribute what is printed.[18] (Publication: New York Times Co. v. United States, *supra*, 403 U.S. 713, 91 S.Ct. 2140; New York Times Co. v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; Avins v. Rutgers, State University of New Jersey (3d Cir. 1967) 385 F.2d 151, cert. denied, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982; Opinion of the Justices (1967) 353 Mass. 779, 229 N.E.2d 263. Distribution: Talley v. California (1960) 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559; Smith v. California (1959) 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205, rehearing denied (1960) 361 U.S. 950, 80 S.Ct. 399, 4 L.Ed.2d 383; Lovell v. Griffin (1938) 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949.) Protection of the anonymity of publishers, printers, and distributors of newspapers and pamphlets is an integral part of press freedom:

"Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. The old seditious libel cases in England show the lengths to which government had to go to find out who was responsible for books that were obnoxious to the rulers. John Lilburne was whipped, pilloried and fined for refus-

ing to answer questions designed to get evidence to convict him or someone else for the secret distribution of books in England. Two Puritan Ministers, John Penry and John Udal, were sentenced to death on charges that they were responsible for writing, printing or publishing books. Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. Along about that time the Letters of Junius were written and the identity of their author is unknown to this day. Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names." (Talley v. California, *supra*, 362 U.S. at 64–65, 80 S.Ct. at 538–539.)

■■■ Inquiries about the identity of persons with whom the witnesses were associated on the newspaper and in the Black Panther Party (Bursey questions 1–24; Presley questions 1–14, 27–31) infringed the right of associational privacy.[19] The chilling effect of compulsory disclosure of one's associations in political activity has been repeatedly recognized. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute . . . [an] effective restraint on freedom of association." (N. A. A. C. P. v. Alabama, *supra*, 357 U.S. at 462, 78 S.Ct. at 1171. *See also* Gibson v. Florida Legislative Investigation Comm., *supra*, 372 U.S. at 543–544, 83 S.Ct. 889; Shelton v. Tucker, *supra*, 364 U.S. at 485–486, 81 S.Ct. 247; Bates

18. A third element of the freedom of press, the freedom to gather news, is not involved in this case. *See* Caldwell v. United States, *supra*, 434 F.2d 1081.

19. The depth of the probe into associational privacy is not always apparent from the face of specific questions. It is revealed from the context in which the questions were asked. For example, Bursey questions 12 and 24 and Presley questions

4–12 asked about the activities of named persons. In context of all the questions asked, it is apparent that a purpose of these questions was to identify the associational relationships among these people and these witnesses. Asking a witness to identify members of his association one at a time is slower than asking for a membership list, but it is ultimately as effective.

v. Little Rock, *supra*, 361 U.S. at 523, 80 S.Ct. 412.) [20]

In the context of this case, the secrecy of the grand jury proceedings did little to soften the blow to the First Amendment rights. The public did not know what the grand jury learned, but the proceedings were no secret to the Government. A Government lawyer initiated the investigation. A Government lawyer presented the evidence to the grand jury. Political dissidents who criticize the Government may well have more fear about disclosure to the Government than to anyone else, and the Government heard every word.

▬▬▬ The Government has legitimate and compelling interests in protecting the President's life and in shielding him from an atmosphere of threats. (Watts v. United States, *supra*, 394 U.S. at 707, 89 S.Ct. 1399.) It has a legitimate and important interest in protecting the armed forces from interference. (Dunne v. United States, *supra*, 138 F. 2d at 140.) It follows that the Government also has similar interests in investigating potential violations of federal statutes that forward those interests. (18 U.S.C. §§ 2, 371, 871, 1751, 2387.) However, the existence of these interests does not automatically override First Amendment rights, and their invocation does not alone carry the Government's burden with respect to any question that the grand jury seeks to force a witness to answer over his First Amendment protest. The fact alone that the Government has a compelling interest in the subject matter of a grand jury investigation does not establish that it has any compelling need for the answers to any specific questions. (*See* Watkins v. United States, *supra*, 354 U.S. at 198–199, 77 S.Ct. 1173.)

▬▬▬ The court must decide whether the Government has carried its burden

almost question by question before it can compel answers. The relationship between the information sought and the interest the Government forwards may be sometimes remote and sometimes substantial. The degree of infringement of First Amendment rights depends upon the specific subject of the inquiry and the means by which the information is adduced. An adequate foundation for inquiry must be laid. (*See* Gibson v. Florida Legislative Investigation Comm., *supra*, 372 U.S. at 557, 83 S.Ct. 889; Shelton v. Tucker, *supra*, 364 U.S. at 488, 81 S.Ct. 247.)

We again turn to the questions that the witnesses refused to answer. For purposes of analysis, the questions which raise serious First Amendment issues can be divided into four categories.

▬▬ Into the first category fall questions about the identity of members of the Black Panther Central Committee and contacts between Panthers and foreign governments. (Bursey question 21; Presley questions 28–31.) The Government submitted information to the district court that Hilliard had said "We will kill Richard Nixon" and that Hilliard was Chief of Staff of the Party. Hilliard may have used the word "we" editorially, but he may also have said "we" intending to refer to specific persons and those persons may have been the leaders of the Party. The Government has not established that the Black Panther Party has a binding hierarchial structure so that the words of a leader necessarily reflect the views of his colleagues and followers. However, with these questions, the Government has not sought to identify all Party members, but only the highest echelon of the Party with whom Hilliard would be likely to have had close communications. If there were a real plot against the President, the grand jury could have inferred

---

20. Presley questions 15–17, 26, 27 concerning possession of firearms, guerrilla training, etc., and Presley questions 18–25 concerning conversations about weapons and threats peripherally affect freedom of expression and association. The connection

between those inquiries and the legitimate subjects of the investigation is so apparent and substantial and the impact of those inquiries on lawful associations and protected expression so slight that governmental interests must prevail.

that foreign governments may have been involved.

The grand jury was empowered to investigate possible plots to threaten or to kill the President. In performing its duty, the grand jury was entitled to elicit information step by step to decide whether Hilliard was speaking rhetorically or whether he was speaking of and for Panther leaders or other persons. It was entitled to ask preliminary questions to ascertain if foreign governments may have been involved in a possible plot. We cannot say that there was no substantial possibility that a plot existed and that the plotters were Panther leaders who may have received aid from foreign governments. The Government's interest in protecting the President is compelling. Although these questions infringed associational privacy, the infringement is modest and the need for the information appears to be substantial. The foundation for these questions is adequate under these circumstances.

Into the next category fall questions that probed the publication and distribution of the Panther's newspaper and pamphlets. (Bursey questions 1–16; Presley questions 1–14.) These questions infringed both associational privacy and press freedom, but the deepest cuts were into press freedom. The Government showed that the Hilliard speech and the Cleaver article were printed and reprinted by the Panthers, that the format of the publication highlighted the speech and the article, and that previous testimony of the witnesses indicated that the paper was intended to reflect the Party's views.[21] The foundation for these questions was insufficient.

There are three theories upon which potential criminal liability could be fastened upon the printers, publishers, or distributors of the speech and the article: (1) the act of printing, publishing, or distributing these materials was itself criminal, (2) the printers, publishers, and distributors were the "we" to whom Hilliard referred in his speech, and (3) the actors were directly or vicariously responsible for Hilliard's and Cleaver's expressions which were criminal.

Printing, publishing, or distributing the speech or the article is not criminal unless the persons who did these acts had the specific intent required by the statutes which were the basis of the investigation. The Government made no showing that there was a substantial possibility that any of the actors had the requisite intent. All news publication reflects to some degree the views of its publisher, at least insofar as it indicates his view of an item's newsworthiness. The act of printing, publishing, or distributing the speech or article supplies no basis for an inference that the act was done with the proscribed intent.

The Government suggests that the republication and highlighting of the article and speech sufficiently colored these neutral acts to raise an inference of intent. We disagree. Of course, these decisions reflect editorial judgment. So also do the decisions about what should be published initially, how much space should be allocated to the subject, or the placement of a story on the front page or in the obituary section. But no inference arises from that exercise of editorial judgment that the person who made the decision may have had the specific intent required to subject him to criminal liability.

Were we to hold that the exercise of editorial judgments of these kinds raised

21. Production of reports that members of the Party and persons associated with members had had violent confrontations with police and that some Panthers had been charged with or convicted of crimes of violence added nothing of significance to the foundation. It would not be hard to prove that registered Republicans and Democrats have been charged with crimes of violence, but that fact would raise no inference that other members of the same parties were violent, or that violence was a plank in the party platform, or that the publishers or distributors of party newsletters shared some kind of guilt by association.

an inference that the persons involved in the judgments had or may have had criminal intent, we would destroy effective First Amendment protection for all news media. It will be recalled that Hilliard's speech was nationally reported. If Bursey and Presley can be required to disclose the identity of all persons who worked on the paper and the pamphlets, to describe each of their jobs, to give the details of financing the newspaper, any editor, reporter, typesetter, or cameraman could be compelled to reveal the same information about his paper or television station, if his paper or station carried the story. The First Amendment forbids that result.

The Government's foundation is no firmer on the alternate theories that those persons who were connected with the paper aided and abetted Hilliard or Cleaver or conspired with either of them. No acts other than those heretofore described are involved, and those acts either separately or together simply raise no inference of potential criminality. The Government has failed to demonstrate that this line of interrogation bore a substantial connection to the compelling subject matter of the investigation, and it has not shown that these destructive means of interrogation were necessary to vindicate its interest in protecting the President or the armed forces.

■ The third group of questions concerned the identity of persons pictured in *Life* magazine. (Bursey questions 17–20). The background of the photographs had been identified as the shop in which the Panther paper was printed. There was also testimony that almost all of the people in the photographs were members of the Party, although their names had not been revealed. Response to these questions would have disclosed, in whole or in part, the same information that was directly sought when the witnesses were asked to name the persons who worked on the paper. The indirect approach is no better than the direct route that we foreclosed for lack of foundation.

■ In a class by themselves are Bursey questions 22–24 and Presley question 27. Presley question 27 is broad enough to encompass a Party leader's source of carfare as well as his source of funds for national or international journeys. To require a member of an association, especially a dissident political party, to reveal the details of its funding is as effective a chilling device as is compulsory disclosure of its membership lists. The United States maintains diplomatic relations with Algeria, and we cannot say that foreign travel generally or to Algeria specifically is sufficiently suspicious to overcome the First Amendment interests involved. A response to these questions may have produced some evidence substantially connected to the compelling objects of the investigation, but it may also have produced a quantity of information that was none of the grand jury's business. When First Amendment interests are at stake, the Government must use a scalpel, not an ax. There was no justification for these questions, and the witnesses cannot be compelled to answer them.

## IV. MOOTNESS

■ Bursey and Presley were each committed to custody until she complied with the district court's order to testify or the term of the grand jury expired. We assume that the term of the grand jury has expired during the pendency of the appeal. Nevertheless, the appeal is not moot.[22]

The case presents federal constitutional questions affecting fundamental personal liberties. Adjudication of those

---

22. 28 U.S.C. § 1826, concerning the confinement of a witness held in contempt for refusal to answer questions of a grand jury and stating that "Any appeal from an order of confinement under this section shall be disposed of . . . not later than thirty days from the filing of such appeal" is inapplicable to this case. Section 1826 did not become effective until after the appeal herein had been filed.

issues should not be thwarted by resort to narrow interpretations of the doctrines of mootness and justiciability. Moreover, the history of this case, together with the related litigation growing out of the same incidents involving Hilliard, strongly suggests that the Government will renew its efforts before another grand jury to obtain the information it sought to compel in the case before us. Postponement of the decisions of the important constitutional issues that have ripened here is not in the interests of the public, the Government, or the witnesses. (*See* Moore v. Ogilvie (1969) 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1; Carroll v. President and Com'rs of Princess Anne (1968) 393 U. S. 175, 178–179, 89 S.Ct. 347, 21 L.Ed.2d 325; Sibron v. New York (1968) 392 U.S. 40, 50–58, 88 S.Ct. 1889, 20 L.Ed. 2d 917; Carafas v. LaVallee (1968) 391 U.S. 234, 237–240, 88 S.Ct. 1556, 20 L. Ed.2d 554; Division 1287 of Amalgamated Ass'n of St., Electric Ry. & Motor Coach Employees v. Missouri (1963) 374 U.S. 74, 77–78, 83 S.Ct. 1657, 10 L.Ed.2d 763, rehearing denied, 375 U.S. 870, 84 S.Ct. 29, 11 L.Ed.2d 100; Gray v. Sanders (1963) 372 U.S. 368, 375–376, 83 S. Ct. 801, 9 L.Ed.2d 821; United States v. W. T. Grant Co. (1953) 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303; Southern Pac. Terminal Co. v. Interstate Commerce Comm. (1911) 219 U.S. 498, 514–516, 31 S.Ct. 279, 55 L.Ed. 310; United States v. Trans-Missouri Freight Association (1897) 166 U.S. 290, 307– 310, 17 S.Ct. 540, 41 L.Ed. 1007; Washington Free Community v. State's Att'y of Montgomery Co., Md. (D.Md.1970, 3-judge court) 310 F.Supp. 436, 442– 443.)[23]

## V. CONCLUSION

In 1734, William Cosby, the English governor of New York, sought to have the publisher of a radical newspaper with extremely limited circulation indicted for criminal libel. The grand jury twice refused to indict. Thereafter, the publisher, Peter Zenger, was charged with libel in an information and one of the most celebrated trials in American history followed. It was with this and similar precedents fresh in their memories that our founding fathers incorporated into the Fifth Amendment the requirement that no person shall be held to answer for an infamous crime except upon the presentment or indictment of a grand jury.

Today, courts across this country are faced with an increasing flow of cases arising out of grand jury proceedings concerned with the possible punishment of political dissidents. It would be a cruel twist of history to allow the institution of the grand jury that was designed at least partially to protect political dissent to become an instrument of political suppression. The words of Mr. Justice Clark are particularly appropriate:

"This is another of five proceedings before this Court during the present Term in each of which the privilege against self-incrimination has been asserted in the course of federal grand-jury investigations. A number of similar cases have been considered recently by the lower courts. The signal increase in such litigation emphasizes the continuing necessity that prosecutors and courts alike be 'alert to repress' any abuses of the investigatory power invoked, bearing in mind that while grand juries 'may proceed, either upon their own knowledge or upon the examination of witnesses, to inquire . . . whether a crime cognizable by the court has been committed', Hale v. Henkel, 1906, 201 U.S. 43, 65, 26 S.Ct. 370, 375, 50 L.Ed. 652 (1906), yet 'the most valuable function of the grand jury [has

---

23. Here, unlike St. Pierre v. United States, (1943) 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199, appellate review was undertaken before the term of the grand jury had expired. (*Cf.* Sibron v. New York, *supra*, 392 U.S. at 50–58, 88 S.Ct. 1889; Carafas v. LaVallee, *supra*, 391 U.S. at 239, 88 S.Ct. 1556; United States v. Trans-Missouri Freight Association, *supra*, 166 U.S. at 307–310, 17 S.Ct. 540.)

been] not only to examine into the commission of crimes, but to stand between the prosecutor and the accused,' *id.*, 201 U.S. at page 59, 26 S. Ct. at page 373, 50 L.Ed. 652. Enforcement officials taking the initiative in grand-jury proceedings and courts charged with their superintendence should be sensitive to the considerations making for wise exercise of such investigatory power, not only where constitutional issues may be involved but also where the noncoercive assistance of other federal agencies may render it unnecessary to invoke the compulsive process of the grand jury." (Hoffman v. United States (1951) 341 U.S. 479, 485, 71 S.Ct. 814, 817, 95 L.Ed. 1118.)

The order is reversed, and the cause is remanded for further proceedings consistent with the views herein expressed.

## OPINION ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

HUFSTEDLER, Circuit Judge:

In seeking a rehearing, the Government makes three contentions: (1) The rationale of the Supreme Court's decisions in Branzburg v. Hayes, In Matter of Pappas, and United States v. Caldwell (1972) 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, is inconsistent with our reasoning in *Bursey*, requiring us to reconsider our disposition of the First Amendment issues. (2) Our distinction between relevancy of questions to the subject matter of the grand jury investigation and relevancy of the same questions to the subject matter of the investigation as to which the witnesses were immunized is contrary to prior authority. (3) Our requirement that the grand jury

must show a logical connection between the subject of the question and the subject matter of the investigation for which the witness was immunized to enable it to lay the foundation for contempt impermissibly invades the traditional secrecy of grand jury proceedings. We reject all three contentions.

First, *Branzburg, Pappas,* and *Caldwell* are not inconsistent with either our reasoning or the result we have reached. The central issue in the newsmen's trilogy was whether the First Amendment protects a newsman from enforced disclosure to a grand jury of his confidential sources of information. The press function with which the Court was concerned was news gathering.

News gathering is not involved in our case.[1]

The question whether the First Amendment ever protects a newsman from being required to appear before a grand jury, a subsidiary issue in the newsman's trilogy, never arose here. Bursey and Presley repeatedly appeared and testified.

We have rejected, as did the Supreme Court, arguments that the district court could and should require the Government or the grand jury to make a preliminary showing before the grand jury can ask questions of the witnesses. (Compare Branzburg v. Hayes, *supra*, 408 U. S. at p. 665, 92 S.Ct. 2646, with Bursey v. United States, *supra*, 466 F.2d at p. 1073.) We require limited showings only after the witnesses decline to answer questions asserting their First and Fifth Amendment rights and only when the grand jury seeks to compel answers through the contempt power of the court.

Nothing in *Bursey* permits a grand jury witness to refuse on First Amendment grounds to identify a person whom

---

1. In the early stages of the contempt proceeding when the district court had only a peripheral look at the investigation, the district court thought that a newsman's privilege, similar to *Caldwell*, was at issue in *Bursey*. As the proceedings advanced, the district court retreated from its earlier view. (In re Grand Jury

Witnesses, 322 F.Supp. 573, 577–578 (N.D.Cal.1970).) When the record unfolded before us, it became evident that *Caldwell* presented a different problem and that news gathering was never a real issue here. (See Bursey v. United States (9th Cir. 1972) 466 F.2d p. 1084 and n. 18).

he has seen committing a crime. Indeed, we have held that the witnesses can be required to answer questions much less directly related to criminal conduct. (Bursey v. United States, *supra,* 466 F.2d at p. 1083.) We refused, however, to issue a carte blanche to a grand jury to override First Amendment rights simply because the questions that the witness refused to answer might have something vaguely to do with conduct that might have criminal consequences. We were obliged to draw some lines that were not on the Supreme Court's balance sheet. Thus, we required the grand jury to establish that there was a "substantial connection" between the information sought and the criminal conduct which the Government was investigating before the witnesses could be held in contempt for refusing to answer questions that cut deeply into First Amendment rights.

Although there is some language in Mr. Justice White's opinion in *Branzburg* (408 U.S. at p. 665, 92 S.Ct. 2646) implying that a grand jury investigation carries with it ingredients that may favor balance for the Government as against the First Amendment, the passage does not purport to disavow the balancing standards enunciated in such cases as DeGregory v. Attorney General of New Hampshire (1966) 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292; Gibson v. Florida Legislative Investigation Committee (1963) 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929, and Bates v. Little Rock (1960) 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed. 2d 480.[2]

We have reexamined our analysis of the factors involved in balancing the First Amendment rights against the governmental interests asserted to justify compelling answers to the questions here involved, and we have concluded that the balance we struck is not impaired by *Branzburg*.

Second, the distinction we drew between relevancy of questions to the grand jury investigation and relevancy of the

same questions to the grant of immunity is not contrary to prior authority. In Brown v. United States (1959) 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609, the questions that the witness refused to answer were conceded to be relevant to the subject matter of the immunized investigation. (*Id.* at 42, 79 S.Ct. 539.) The precise issue was not raised nor decided in United States v. Weinberg (9th Cir. 1971) 439 F.2d 743 and Carter v. United States (9th Cir. 1969) 417 F.2d 384, cert. denied 399 U.S. 935, 90 S.Ct. 2253, 26 L.Ed.2d 807, rehearing denied, 400 U.S. 855, 91 S.Ct. 27, 27 L.Ed.2d 93.

We recognize that there are dicta from the Third and Seventh Circuits that imply that immunity conferred under former 47 U.S.C. § 409(*l*) was coextensive with the questions asked. (*See* In re Grand Jury Investigation of Giancana (7th Cir. 1965) 352 F.2d 921, cert. denied, Giancana v. United States, 382 U.S. 959, 86 S.Ct. 437, 15 L.Ed.2d 362, and Marcus v. United States (3d Cir. 1962) 310 F.2d 143, cert. denied, 372 U.S. 944, 83 S.Ct. 933, 9 L.Ed.2d 969.) We doubt that the same courts would construe Section 2514 as they did Section 409(*l*). But if our doubts are groundless, we would reject their construction of Section 2514, and we would continue to rely on the reasoning of Chief Judge Friendly in In re Vericker (2d Cir. 1971) 446 F.2d 244, 247–248.

Third, we reject the argument that our foundational requirements impermissibly invade the secrecy of grand jury proceedings. Secrecy for secrecy's sake in the conduct of government has little to recommend it in a free society. The three principal reasons advanced to preserve secrecy in grand jury investigations are: to aid law enforcement by forestalling flight, preventing the loss of testimony, and the like; to facilitate the investigation by encouraging disclosures without fear of reprisal; and to protect the innocent from groundless accusation. We fail to see how the limited disclosures

2. Mr. Justice Powell's reading of Mr. Justice White's opinion reinforces our view of the limited reach of the plurality's rationale. Branzburg v. Hayes, *supra*, 408 U.S. at pp. 709–710, 92 S.Ct. 2670 (concurring opinion).

that we require would impair any of those objectives.

Both in Branzburg v. Hayes, *supra*, 408 U.S. at p. 665, 92 S.Ct. 2646, and in Gravel v. United States (1972) 408 U.S. 606, at 680 n. 18, 92 S.Ct. 2614, 33 L.Ed. 2d 583, the Court reaffirmed the power and the duty of the district court to keep grand jury proceedings within constitutional bounds. That power is forfeited and the duty is barren if the Court cannot penetrate the shield of secrecy enough to see any assaults upon the constitutional ramparts.

The petition for rehearing is denied. The full court has been advised of the suggestion for an en banc hearing. No judge has requested a vote thereon. Accordingly, the suggestion for a rehearing en banc is rejected.